**HEARST BUSINESS PUBLISHING, INC., Plaintiff,**

v.

**W.G. NICHOLS, INC., Defendant.**

**No. 99 Civ. 10164(DC).**

United States District Court, S.D. New York.

Nov. 30, 1999.

Patterson, Belknap, Webb & Tyler LLP, by Gregory L. Diskant, Frederick B. Warder III, Douglas J. Widmann, Carrie A. Mandel, New York City, for plaintiff.

Duane Morris & Heckscher LLP, by Fran M. Jacobs, David S. Tannenbaum, Edward G. Biester III, Robert E. Rosenthal, New York City, Philadelphia, PA, for defendant.

Whitman Breed Abbott & Morgan LLP, by Thomas G. Bailey, John E. Tardera, Robert S. Tesler, New York City, of counsel J. Paul Williamson, Arnold, White, & Durkee, Washington, D.C., Maureen McArdle, Cahners Business Information, New York City, for intervenor-defendant.

## OPINION

CHIN, District Judge.

In the automotive repair industry, "Chilton time" refers to estimates of the labor time required to perform certain automotive maintenance and repair tasks. These estimates were compiled by the Chilton Company ("Chilton"), are widely used throughout the industry in determining labor charges, and have become an industry standard.

After selling certain assets, Chilton went out of business in 1997. Plaintiff Hearst Business Publishing, Inc. ("Hearst") acquired the copyrights to "Chilton time," or the labor time estimates compiled to that date, but it acquired only a limited license to use the Chilton name. That limited license has expired, but Hearst plans to publish another labor guide containing time estimates described in the book as "Chilton time." Defendant W.G. Nichols, Inc. ("Nichols") acquired certain rights to use the Chilton name, but it has no rights to the information known as "Chilton time."

These competing ownership interests recently came to a head when Nichols announced the publication of its own labor guide using the Chilton mark, which will contain its own estimates of automotive labor times. These estimates are not Chilton time, but Nichols is nonetheless calling its publication a "Chilton" labor guide.

Hearst moves for a preliminary injunction to enjoin Nichols from proceeding with the publication and marketing of its labor manual using the Chilton name, arguing that Nichols has violated the Lanham Act's false advertising and unfair competition prohibitions[1] by misleading customers into believing that (1) Nichols is a successor to Chilton when it is not and (2) they are buying Chilton time when they are not.

Nichols's principal defense is that it has the exclusive right to associate its products with the Chilton trademark pursuant to its exclusive trademark agreement with Cah-

---

1. Plaintiff has withdrawn its copyright infringement claim as a basis for its application for a preliminary injunction.

ners Business Information ("Cahners"), a division of Reed Elsevier, Inc. ("Reed"), which owns the Chilton trademark. Nichols also asserts equitable defenses.

For the reasons that follow, the motion is granted to the extent set forth below. The following constitute my findings of fact and conclusions of law.

## FINDINGS OF FACT

### A. The Chilton Company

Founded in 1922, Chilton published books and magazines on various subjects, including automotive maintenance and repair publications both for the consumer or "do-it-yourself" customer and for the professional technician. (Morgantini Decl. ¶ 6). Certain professional automotive publications contained estimates of the time required to perform thousands of different automotive maintenance and repair operations, created by Chilton's editorial staff. These estimates, which became industry standards, were known in the industry as "Chilton labor time," or simply, "Chilton time." Chilton time is frequently used as a basis for determining labor charges at automotive dealers and repair shops across the country.[2] (Carr Decl. ¶ 12).

Chilton published Chilton time in two professional automotive manuals; the "Chilton's Labor Guide and Parts Manual" included Chilton time as well as information on replacement parts for hundreds of different car and truck models produced in a five-year period, while the "Chilton's Labor Guide Manual" contained only Chilton time for hundreds of car and truck models marketed in the United States over a 20-year period (Carr Decl. ¶ 11; Morgantini Decl. ¶ 5). Both the parts and labor guide and the labor-only manual (collectively, "Chilton Labor Guides") were published in a dark-green cover with orange type. (Carr Decl. ¶ 11).

**2.** In addition, Chilton time is often cited in contracts between insurance companies offering extended automotive warranties and their

The Chilton Automotive Books Division (the "Automotive Books Division"), a separate operating entity within Chilton, published all of Chilton's automotive books. (Morgantini Decl. ¶ 7). The marketing and sales operations of the Automotive Books Division were separated institutionally into two divisions, a Professional Automotive Division (the "Professional Division") and a Consumer Automotive Division (the "Consumer Division"), each with its own budget and staff. (Morgantini Decl. ¶ 8). All of the books created by the Automotive Books Division were branded and marketed under the Chilton name.

### B. Chilton Sells Its Assets

#### 1. The Motor–Chilton Transaction

In June 1997, Capital Cities/ABC ("ABC"), which owned Chilton, sold certain Chilton assets relating to the automotive publishing business. Motor Informational Systems, Inc. ("Motor"), a Hearst division, purchased "certain of [Chilton's] existing properties and assets . . . used exclusively by the Professional Automotive Division," including inventories of books and other materials relating exclusively to the Professional Division, and copyrights relating to all publications, including the Chilton Labor Guides, published exclusively by the Professional Division, subject to specified exclusions. (Def.Ex.24, ¶ 1.1). Motor was primarily interested in adding the Chilton Labor Guides to its existing professional automotive repair line, in hopes of capturing Chilton's share of that market. (Carr Decl. ¶ 6; Tr. at 69–70).

Motor attempted to obtain an exclusive license to use the Chilton name, but was unable to negotiate such an agreement. (Tr. at 45). Motor was able to obtain a limited right to use the Chilton name in a trademark license agreement (the "Motor Trademark Agreement") executed contemporaneously with the Motor Purchase

affiliated repair centers and in labor agreements between repair shops and mechanics. (Tr. at 13, 75).

Agreement. By the terms of the Motor Trademark Agreement, Motor obtained a two-year non-exclusive worldwide license to use the name "Chilton/Motor Labor Guide and Parts Manual" in the publication of a professional labor guide, including revisions and updates. (Def.Ex.25, ¶ 2.1(b)). In addition, Motor's use of the name "Chilton/Motor Labor Guide and Parts Manual" was further restricted; the Chilton name could be used only in combination with the Motor name, and the Motor name had to be in a different typeface and color than the Chilton name. Finally, the Motor name had to be at least as prominent as the Chilton name. (*Id.* at ¶ 2.1(b)).

Under the Motor Trademark Agreement, Motor's right to use the Chilton name expired on June 26, 1999, and after the expiration date, Motor was not authorized to use the Chilton name in connection with any reprints, updates, or re-issuances of its labor guide, but could only sell existing inventories of its publications containing the Chilton name. (*Id.* at ¶ 2.1(a), (b)). Motor had no right to use the "Chilton" name except as provided in the Trademark License Agreement, and Chilton retained the ownership of and all rights to the Chilton mark except as detailed in the Motor Trademark Agreement. (Def.Ex. 24, ¶ 1.2; Def.Ex. 25, ¶ 2.2).

### 2. *The Nichols–Chilton Transaction*

Nichols also purchased certain Chilton assets from ABC in June 1997. Nichols acquired "all of [Chilton's] existing properties, assets and business [related] exclusively to the Consumer Automotive Division," with certain exceptions. Included in the purchase were Chilton's library of resource materials for the years 1990 and later, the Consumer Division's inventories of books and other materials, and all copyrights, patents, trademarks, service marks, and trade names relating exclusively to the

Consumer Division. (Def.Ex.19, ¶ 1.1(f), (j); Tr. at 80).

The asset purchase agreement contained an "Excluded Assets" clause, which specified that any assets relating to any Chilton business other than the Consumer Division and not utilized exclusively in the operation of the Consumer Division were excluded from the sale, as was "the right to use the name 'Chilton,' except as provided in the Trademark License Agreement." (Def.Ex. 19, ¶ 1.2). By the terms of the Trademark License Agreement (the "Nichols Trademark Agreement") Nichols obtained a two-year license to use the Chilton name on all existing consumer automotive publications, as well as the right to use the Chilton name on any new consumer automotive publications created by Nichols. (Tr. at 85).

Finally, the asset purchase agreement also required Nichols to "offer employment to substantially all employees of the Consumer Automotive Division." (Def.Ex.19, ¶ 6.2). Nichols offered employment to the entire staff of the Consumer Division, and hired many former Chilton employees from both the Consumer and the Professional Divisions, including twelve members of the Chilton Automotive Books Division editorial staff. (Morgantini Decl. ¶ 15 & Ex. B).

### 3. *Chilton Goes Out of Business*

After selling various assets of Chilton's automotive repair publication business to Motor, Nichols, and a third company,[3] ABC sold the remainder of Chilton—including the Chilton trademark and trade name—to Reed for $447,000,000. (Lillis 10/21/99 Decl. ¶ 3). Reed merged Chilton into its Cahners division, and Chilton ceased to operate as an independent company. (Morgantini Decl. ¶ 22).

**3.** SPX Corporation, a manufacturer of tools for automotive repair, acquired an electronic database of professional automotive repair information and related electronic publishing assets from Chilton. (Lillis 10/21/99 Decl. ¶ 4).

## C. *Motor's Labor Guide*

After the asset purchase, Motor integrated the Chilton Labor Guides into its existing product line, publishing a labor guide under a joint "Motor/Chilton" title in a dark green cover with orange type. (Carr Decl. ¶ 15; Tr. at 18). Motor's sales force informed its customers that Chilton's Professional Division had gone out of business, that Motor had purchased the copyrighted Chilton titles, and that Motor would be selling updates and revisions of Chilton's Labor Guides for a transitional two-year period, after which the manuals would be sold under the Motor name alone. (Carr Decl. ¶ 15; Tr. at 17). Motor published several updates of the Chilton Labor Guide under the "Motor/Chilton" name. (Tr. at 19; *see also* Tr. at 56). In 1997 and 1998, the labor guides were Motor's highest-selling books, both in terms of profit and units shipped. (Carr Decl. ¶ 16).

Anticipating the expiration of the Motor Trademark Agreement, Motor attempted to negotiate an extension and an expansion of its trademark license. In a letter to Cahners dated December 8, 1998, Motor's publisher requested an exclusive worldwide license and also asked for the right to use the Chilton name on *all* professional automotive service and repair information products. (Lillis 10/21/99 Decl.Ex. 4). Cahners denied Motor's request, and advised Motor that Cahners would not renew Motor's license. Motor could continue to sell existing inventories of the labor and parts guide and labor-only manuals containing the Chilton name, as provided in the Motor Trademark Agreement, but after the expiration of that agreement, Motor could no longer use the Chilton name on future versions of its labor guides. (Def.Ex.7).

Despite its failure to obtain an extension of its license from Cahners, Motor intends to use the Chilton name in its upcoming labor guide, currently scheduled for release in December 1999. Entitled "Motor Labor Guide Manual 1980–2000," the new guide (the "Motor Labor Guide") will contain labor times, identified as "Chilton time," for repair operations for model years 1980–1997 and for repair operations that did not change in model years after 1997. For new repair operations in model years 1998–2000, the manual will contain labor times created by Motor's editors, described as "Motor time." (Tr. at 19; Def.Ex. 51; Pl.Ex. 35). Motor intends to publish its labor guide in a dark-green cover with orange type, and will sell the guide for $140. (Tr. at 55, 105; Def.Ex. 62).

## D. *The Nichols–Cahners Exclusive Trademark License Agreement*

In 1997, after its acquisition of Chilton's Consumer Division assets, Nichols began publishing consumer automotive repair books bearing the Chilton trademark, continuing to publish and update existing Chilton lines and creating new publications covering additional models and years of automobiles. (Morgantini Decl. ¶ 21; Tr. at 86). Nichols now publishes approximately 275 titles under the Chilton brand. (Morgantini Decl. ¶ 21).

Nichols began negotiating with Cahners for a new trademark license in December 1998, at approximately the same time that Motor was attempting to negotiate a new trademark agreement with Cahners. In March 1999, Cahners and Nichols entered into a trademark license agreement (the "Nichols–Cahners Agreement") that granted Nichols an exclusive worldwide license, effective June 26, 1999, to use the Chilton mark in connection with *all* automotive repair publications, consumer and professional, for a ten-year period.[4] (Morgantini Decl. ¶ 24; Def.Ex. 6; Lillis 10/12/99 Decl. ¶ 8). The Nichols–Cahners Agreement prohibited Nichols from using the Chilton

---

4. Cahners retained the rights to the professional automotive magazines published under the Chilton name and continues to publish those magazines, although the cover and masthead references to Chilton ceased in 1998. (Lillis 10/21/99 Decl. ¶ 8).

mark in its corporate or trade names or "in any fashion which may cause confusion as to the source of the products distributed by [Nichols]." (Def.Ex.6, ¶ 2.6(c)).

## E. *Nichols's Labor Guide and Advertising Campaign*

In early 1999, Nichols began to create its own labor guide (the "Nichols Labor Guide"), targeted at the professional automotive repair market and scheduled for release in the fall of 1999. In a second-quarter press release, Nichols announced its intention to publish the new labor guide under the title "Chilton's Labor Guide 1981–2000." (Morgantini Decl. ¶ 26 & Ex. E; Tr. at 61, 92, 111–12). The planned cover design of Nichols's upcoming labor guide is very similar to that of the Chilton Labor Guides, and the Nichols guide will be published in a green cover with orange type. (Tr. at 118–19; Def.Ex. 59). Nichols plans to sell its guide for $125. (Tr. at 105). Nichols mounted an intense promotional campaign for the manual in July of 1999.

Nichols launched an extensive print advertising effort in national and regional trade publications. A banner at the top of one advertisement reads "The Name You Know and Trust ... The Manual You'll Come to Rely On." Below, in large black block letters, appears the title of the manual, "Chilton's Labor Guide 1981–2000," accompanied by a picture of the book and a CD–ROM; Nichols is identified as the guide's publisher in smaller letters at the bottom of the page. A paragraph appearing below the picture reads "Even our competition says Chilton's Professional Manuals are: '... the manuals which were established as the industry standard by decades of reliable accuracy ... manuals that automotive repair professionals need or want.'" (Carr Decl.Ex. C). The Nichols advertisement ran in the August 1999 issues of Pennsylvania Automotive and Insider News ("Insider News") and Motor Age magazines, as well as in several other

publications. (Carr Decl.Ex. C; Pl.Ex. 11).

The quote in the advertisement was lifted from a flyer distributed several months earlier by a Motor sales representative in an attempt to inform customers that the upcoming Nichols Labor Guide was *not* the latest version of the well-known Chilton manual. (Tr. at 23). The Motor flyer actually read, "[Nichols's manuals] are *not* the manuals which were established as the industry standard by decades of reliable accuracy.... They are *not* the Chilton Profession [sic] Repair Manuals that automotive repair professionals need or want." (Carr Decl.Ex. D) (emphasis added).

Nichols also promoted its forthcoming labor guide through a direct mailing campaign, targeted at professional automotive customers. A postcard mailed to selected customers in late July 1999 contained a picture of the guide, identified in large block letters as "Chilton's Labor Guide 1981–2000," and the slogan "The Name You Know and Trust ... The Manual You Will Rely On." The back of the postcard named Nichols as the publisher of the manual. (Def.Ex.14). A mailer sent out upon request to professional automotive customers and a brochure distributed by a marketing distribution company affiliated with Nichols also contained the same title, picture and slogan; these materials identified Nichols as the guide's publisher. (Def.Ex.11, 15). Nichols also sent out an informational fax to prospective professional automotive customers, under the heading "Nichols Publishing—Chilton Books." The fax described "Chilton Publishing" as the "[w]orld's original automotive repair information company.... Founded in 1922. Over 75 years in business.... Still a market leader." The fax also stated that "Nichols Publishing purchased Chilton Repair in June 1997," when no entity known as "Chilton Repair" ever existed. (Pl.Ex. 40; Tr. at 31–32).

In addition, Nichols hired a telemarketing firm, Farm Journal, to promote and sell the Nichols Labor Guide and other

Nichols publications. Farm Journal telemarketers both responded to questions from callers who phoned the "Chilton" information line and made telemarketing calls to sell Chilton brand products published by Nichols. Callers dialed "1-877-4 CHILTON" to order the Chilton line of books from Nichols, and Farm Journal's representatives answered "Chilton Calling Center" when picking up a call.

In July 1999, Farm Journal began making tens of thousands of sales calls to promote the Nichols Labor Guide, working from a script created by Nichols. (Morgantini Decl. at ¶ 51–52; Tr. at 123). The script opened with the telemarketing representative identifying himself or herself as working with "Chiltons [sic] Automotive Repair Manuals." The caller was soon asked if he or she was "familiar with the Chilton Company and its Professional Shop Manuals." If the caller answered yes, the script directed the telemarketer to respond, "Chilton's newest product is the 1981–2000 Labor Guide Manual," and to describe the new labor guide. If the caller answered no, the telemarketer explained that "[t]he automotive repair books division of Chilton's is now a part of W.G. Nichols Publishing," described Chilton as "an automotive tradition since 1925," and then told the caller about the upcoming "Chilton Labor Guide 1981–2000."

Nichols Publishing is not mentioned anywhere else in the script. In other words, if the script is followed, the caller who has familiarity with the Chilton name never hears the name "Nichols" mentioned; only those callers who affirmatively state that they have no familiarity with Chilton are told that a former Chilton division is now a part of Nichols. (Pl.Ex. 16; Tr. at 123–29).

The Farm Journal telemarketers departed from the prescribed script on several occasions. For example, on August 31, 1999, a Motor vice president, Kevin Carr, called the telemarketing center, pretending to be a customer. Carr first spoke to an Farm Journal operator at the

"Chilton Calling Center," who implied that Motor had wrongfully used Chilton information when Motor "bought some of [Chilton's] unused inventory ... put their name on it and were selling it like Chilton Motors." (Carr Decl.Ex. A at 3). This operator transferred Carr to Ron, a Farm Journal sales representative, who told Carr that

> [Chilton] took [Motor] to court in January of this year, because ... they were telling people when they bought it that they had bought Chilton out and Chilton was no longer in business.... That's not true at all.... We took them to court in January. They did settle with Chilton, and I can't tell you how much money was involved.

(Carr Decl.Ex. A at 7–8).

In fact, none of these events ever occurred. (Tr. at 29; Morgantini Decl. ¶ 54). In addition, Ron implied that Motor's sales representatives were lying when they told customers that Motor had bought Chilton's Professional Division and that Chilton was no longer in business. (Carr Decl.Ex. A at 8). Ron went on to say that the new Nichols Labor Guide would contain the same Chilton times from the previous Chilton labor guides, when, in fact, the times in the Nichols Labor Guide were different. (Carr Decl.Ex. A at 11). Throughout the conversation, Ron suggested to Carr that the company he worked for, Nichols, was the same Chilton company that had been operating continuously for 75 years. (Carr Decl.Ex. A; Tr. at 28–30). Several Motor customers reported having similar conversations with Nichols's telemarketing representatives, in which they were led to believe that Nichols was Chilton, the same company that had previously sold them their labor guides. (Decl. of R. McPherson, R. Kelly, L. Clark).

Nichols acknowledges that Farm Journal employees or contractors made false and misleading statements in certain sales calls on behalf of Nichols, but contends that it took steps to correct the telemark-

eting firm's errors. (Tr. at 98, 105, 134). When Nichols became aware in early October 1999 that Farm Journal had told at least one caller that Nichols had sued Motor, Nichols explained to Farm Journal that it had "won" the rights to the Chilton name by contracting with Cahners for the trademark and not by suing Motor, and directed Farm Journal to tell its sales representatives to adhere to the Nichols-approved telemarketing script. (Tr. at 105–06; Pl.Ex. 21, 29). Nichols also instructed Farm Journal to forward any calls from customers who asked questions about Motor directly to Nichols; these calls would be directed to Nichols's CEO or president. (Tr. at 106; Pl.Ex. 29)

Nichols also contends that it has taken steps to correct other misinformation provided to Farm Journal to use in sales calls. The Nichols telemarketing script was supplemented by a sales sheet prepared and distributed by Nichols to Farm Journal telemarketers. (Tr. at 129–30) The sales sheet was entitled "Some points to help fight off Motor," and warned "This is NOT to be distributed ... Use only over the phone!!!!!!!!" (Pl.Ex.20). The sales sheet stated that Motor bought a one-year license to sell Chilton professional automotive products; in fact, Motor had received a two-year license from Chilton to use the Chilton name on its products. (Tr. at 130). The sales sheet also stated that the editor who created the Nichols "Chilton 1981–2000 Labor Guide" was the same editor who had supervised the guide for the past sixteen years, obscuring the fact that Nichols had never published a professional labor guide before. (Tr. at 132). Farm Journal telemarketers used the sales sheet with numerous callers. When Nichols discovered that Farm Journal had been using the sales sheet, it immediately instructed the telemarketing firm to destroy the sheet and to cease using it internally or in conversations with customers. (Tr. at 136).

Nichols and Cahners were aware of the potential confusion that could and probably would result from the use of the Chilton name on Nichols's automotive publications. At some point, Nichols received a February 10, 1998 memorandum from Bruce Barnett, a Cahners executive, on the subject of "Corporate Identity." (Pl.Ex.8). In the memorandum, Barnett discussed the impending name change of Reed Elsevier Business Information to Cahners Business Information, and sought to soothe the concerns of former Chilton employees:

> [Y]ou may be wondering why we didn't name the company Cahners Chilton Business Information. Like Cahners, the name Chilton commands great respect in the marketplace. However, there are some problems with it. Our research has shown that in the minds of many, Chilton is still associated with the Chilton auto repair manuals which we did not buy.

(*Id.*).

## F. *Motor's Reaction to Nichols's Advertising*

Motor knew at least as early as May 1999 that Nichols was planning to release its own labor guide in the fall of 1999 and that Nichols was portraying itself as the successor to Chilton. (Tr. at 19–20, 38, 61–62). In a May 18, 1999 letter to Morgantini, Carr characterized Nichols's attempts to portray itself as Chilton as "misleading and deceptive advertising and unfair competition." Carr warned Morgantini that Motor would pursue legal action against Nichols if Nichols used any of Motor's copyrighted Chilton data in the Nichols Labor Guide. (Carr Decl.Ex. I). Carr sent another letter to Morgantini complaining about Nichols's promotional activities on June 8, 1999. (*Id.*). Nichols responded to Carr's concerns in a letter from its CEO, Rick Van Dalen, dated June 15, 1999. Van Dalen directed Carr to address all future correspondence from Motor to Nichols's attorney, and informed Carr that Nichols would continue to describe itself as "[a]n American tradition

since 1925" because Nichols "acquired Chilton information." (Pl.Ex.45). Despite Nichols's hostile response to its concerns, Motor took a "wait and see" attitude about Nichols's labor guide and advertising. (Tr. at 40).

Motor claims to have discovered in late July or early August 1999 that Nichols intended to call its forthcoming manual "Chilton's Labor Guide and Manual 1981–2000." During this same time frame, and continuing throughout August, Motor was aware of at least some of Nichols's promotional efforts. (Tr. at 40). After Carr spoke to Ron, the Farm Journal telemarketer, on August 31, 1999, Motor began to review possible legal action with its in-house and outside counsel, as well as with Hearst, its corporate owner. Hearst moved for a preliminary injunction by order to show cause on October 1, 1999, and a hearing on the motion was held on October 15, 1999.

## DISCUSSION and CONCLUSIONS OF LAW

■ To obtain a preliminary injunction, Hearst must demonstrate (1) irreparable harm in the absence of the requested relief and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor. *See Castrol, Inc. v. Quaker State Corp.,* 977 F.2d 57, 62 (2d Cir.1992).

### A. *Irreparable Harm*

■ Hearst has demonstrated that it will suffer irreparable harm if a preliminary injunction is not issued. In this Circuit, irreparable harm in a non-comparative false advertising case is demonstrated by a showing that plaintiff will lose sales as a result of defendant's misleading advertising. *Coca–Cola Co. v. Tropicana*

*Products, Inc.,* 690 F.2d 312, 316–17 (2d Cir.1982).[5] In a case where plaintiff's and defendant's products are in head-to-head competition in the relevant market, actual lost sales need not be proved; proof that sales of plaintiff's products would probably be harmed if defendant's advertising tended to mislead consumers in the manner alleged is sufficient to establish irreparable injury. *Id.; see also Johnson & Johnson v. Carter–Wallace, Inc.,* 631 F.2d 186, 189 (2d Cir.1980) ("The correct standard is whether is it likely that [defendant's] advertising has caused or will cause a loss of [plaintiff's] sales, not whether [plaintiff] has come forward with specific evidence that [defendant's] ads actually resulted in some definite loss of sales."). A plaintiff must offer "more than a mere subjective belief that [it] is likely to be injured as a result of the false advertising" and "must submit proof which provides a reasonable basis for that belief." *Coca–Cola,* 690 F.2d at 316–17 (citing *Vidal Sassoon, Inc. v. Bristol–Myers Co.,* 661 F.2d 272, 278 (2d Cir.1981)).

In this case, Hearst and Nichols directly compete for customers in the professional automotive repair publications market. If customers are misled or confused by Nichols's advertising into believing that Nichols is the same company as Chilton and that Nichols's forthcoming book includes Chilton time, it is likely that Hearst will lose a portion of its sales in the professional automotive market. If the professional automotive customer is confused as to which labor guide contains Chilton time, he or she may purchase Nichols's manual instead of Hearst's book.

Several professional automotive customers have submitted affidavits to this effect, stating that because of Nichols's promotional efforts, they believed that Nichols was the same company from which they

---

**5.** By contrast, when the advertising at issue directly compares two competing products, irreparable harm is presumed. *See, e.g., McNeilab, Inc. v. American Home Products Corp.,* 848 F.2d 34, 38 (2d Cir.1988). While Nichols's advertising and telemarketing makes reference to Motor, none of the challenged statements directly compares the Nichols Labor Guide with the Motor Labor Guide.

had previously purchased Chilton Labor Guides and that the upcoming Nichols labor guide was an update of the Chilton labor guides that they had previously bought from Motor. As a result, these customers placed orders for Nichols's new manual, rather than purchasing Motor's new labor guide. (Decl. of R. McPherson, R. Kelly, L. Clark). This evidence demonstrates a causal connection between the alleged false advertising and Hearst's sales position in the market, and is sufficient proof of "more than a subjective belief" that Hearst is likely to be injured as a result of Nichols's false advertising. Hearst will suffer irreparable harm from Nichols's false and misleading advertising if relief is denied.

## B. *The Merits*

In essence, Hearst alleges that Nichols's advertising misleads the professional automotive consumer into believing that Nichols is the same company as Chilton, the publishing company that the professional automotive customer has known and trusted for 75 years, that Nichols is the authorized publisher of Chilton time, and that original and updated Chilton times will be included in the Nichols Labor Guide. Hearst also claims that Nichols has disseminated false information about Motor, namely that Motor was not authorized to print Chilton time and that Motor was sued and paid a monetary settlement for using the Chilton name and Chilton time. I conclude that Hearst has demonstrated a likelihood of. success on the merits of its unfair competition and false advertising claims, for the reasons discussed below.

Section 43(a) of the Lanham Act prohibits unfair competition and false advertising, providing that:

Any person who ... uses in commerce ... any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which

(A) is likely to cause confusion, or to cause mistake, or to deceive as to ...

the origin, sponsorship, or approval of his or her goods [or] services ... or

(B) in commercial advertising, promotion, misrepresents the nature, characteristics [or] qualities ... of his or her or another person's goods [or] services ...

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a) (1998).

■ Under the plain language of § 43(a), any person who believes that he or she is or is likely to be damaged by the false or misleading representations may bring suit under the Lanham Act. To prevail on a Lanham Act false advertising claim, a plaintiff must demonstrate the falsity of the challenged advertisement, by proving that it is either (1) literally false, as a factual matter; or (2) although literally true, still likely to mislead and confuse consumers. *L & F Prods. v. Procter & Gamble Co.*, 45 F.3d 709, 711 (2d Cir.1995) (citing *Johnson & Johnson * Merck v. Smithkline Beecham Corp.*, 960 F.2d 294, 297 (2d Cir.1992)); *accord Castrol*, 977 F.2d at 62; *McNeil–P.C.C., Inc. v. Bristol–Myers Squibb Co.*, 938 F.2d 1544, 1549 (2d Cir.1991).

When the challenged statement is literally or explicitly false, the court may grant relief " 'without reference to the advertisement's impact on the buying public.' " *McNeil–P.C.C.*, 938 F.2d at 1549 (quoting *Coca–Cola Co. v. Tropicana Products, Inc.*, 690 F.2d 312, 317 (2d Cir.1982)). When a plaintiff relies upon the "impliedly false" theory, however, extrinsic evidence must confirm that the advertising is likely to mislead or confuse. *L & F Prods.*, 45 F.3d at 711. In addition, a Lanham Act plaintiff must also establish that the defendant "misrepresented an inherent quality or characteristic" of the product, *National Assoc. of Pharm. Mfrs. v. Ayerst Lab.*, 850 F.2d 904, 917 (2d Cir.1988), a requirement that the Second Circuit has interpreted as "essentially one of materiality." *National*

*Basketball Assoc. v. Motorola, Inc.,* 105 F.3d 841, 855 (2d Cir.1997) (citations omitted); *see also* 3 McCarthy on Trademarks and Unfair Competition § 27:35 at 27–54 (there must be "some showing that the defendant's misrepresentation was 'material' in the sense that it would have some effect on consumers' purchasing decisions").

### 1. *Explicitly False Advertising*

■ Hearst is likely to prevail on its claim that certain statements contained in Nichols's advertising are literally false. The print advertisement that ran in the August 1999 issues of various automotive magazines is the most egregious example of Nichols's literally false advertising. By deliberately omitting the word "not" from a Motor sales representative's fax, Nichols turned what was intended to be Motor's alert to its customers that Nichols's "Chilton" publications were not the same manuals that the automotive industry had trusted and relied upon for 75 years into a ringing endorsement of Nichols's virtually unproven professional publications. The Motor fax that Nichols purported to quote in the August 1999 advertisement actually stated the opposite of what was represented in the ad, bluntly warning the professional automotive customer that the manuals bearing the Chilton name were *not* the products of Chilton's Professional Division, and thus were *not* the publications that had become the industry standard that automotive professionals needed and wanted. (Pl.Ex.11).

In addition, Nichols's telemarketing script contained untrue statements. The script directs sales representatives to tell customers that "Chilton's newest product is the 1981–2000 Labor Guide Manual." In fact, Chilton went out of business after being merged into Cahners in 1997, and as a result, has not published any title since that year. The script further instructs sales representatives to tell callers that "the automotive repair books division is now a part of W.G. Nichols Publishing."

As Nichols's president admitted, Nichols did not purchase the entire Chilton Automotive Books Division; Nichols bought only the Consumer Division of Chilton's automotive publishing business.

Nichols's telemarketing sales force made additional false statements when its members departed from the approved script. In one call, Ron, a Farm Journal representative, told a Motor vice president (posing as a customer) that Motor had used the Chilton name and published updates to the Chilton Labor Guides without permission, was sued by Chilton for its illegal conduct, and was forced to pay a monetary settlement to Chilton. None of these events ever occurred. Later in the same conversation, Ron implied that Motor's sales representatives were lying when they told customers that Motor had bought Chilton's Professional Division and that Chilton was no longer in business. Both of these statements were literally true, and therefore, the Motor sales representatives were not lying in reporting such facts. Ron also told the Motor caller that Nichols's new labor guide would contain the same Chilton times as the previously published Chilton Labor Guides, when, in fact, the times in the Nichols Labor Guide were different from the original Chilton times.

All of the above statements contained in Nichols's advertising and telemarketing campaign are material because they would affect a customer's decision of which manual to purchase. Customers who wanted to purchase the Chilton manuals that they relied upon and trusted would believe that Nichols was the source from which to obtain those products. As a result, they would be more likely to purchase the Nichols Labor Guide rather than the Motor Labor Guide or any other competing labor manual.

### 2. *Implicitly False Advertising*

Hearst has also shown a likelihood of success on the merits with respect to the other challenged statements, demonstrating that these statements, while literally

true, are likely to mislead or confuse the consumer by creating the impression that Nichols is the same company as or the successor to Chilton or that the new Nichols guide is a Chilton product containing original Chilton times. Extrinsic evidence confirms the likelihood of confusion among professional automotive consumers; several Motor customers submitted affidavits attesting to the confusion that resulted from their conversations with Motor's sales representatives. (Decl. of R. McPherson, R. Kelly, L. Clark).

First, several advertisements and direct mailings for the Nichols Labor Guide contained the slogan, "The Name You Know and Trust," a statement that is literally true when applied to Chilton, but likely to mislead when applied to Nichols. While the name "Chilton" may be known and trusted, Nichols, the company that now holds the right to use the Chilton name, has not attained that same level of recognition and trust.

Second, the informational fax sent to prospective customers under the heading "Nichols Publishing—Chilton Books" truthfully identifies Nichols as "Nichols Publishing," but the subsequent linkage to "Chilton Books" is likely to mislead the customer into believing that "Chilton Books" is a part of Nichols Publishing. No entity known as "Chilton Books" currently exists; the assets of the Chilton Automotive Books Division were sold to Nichols and Motor in 1997, and Chilton subsequently went out of business.

The informational fax's further proclamation that "Nichols Publishing purchased Chilton Repair in 1997" is also likely to mislead the consumer by implying that Nichols purchased the automotive repair publishing operations of Chilton. As an initial matter, no entity known as "Chilton Repair" ever existed; Chilton published its consumer and professional automotive repair books through its Automotive Books Division. Moreover, Nichols did not purchase the entire Automotive Books Division, but only purchased certain Consumer Division assets.

In addition, the fax stated that "Chilton Publishing" was "founded in 1922," had been in business for "over 75 years," and was "still a market leader," which is likely to confuse the consumer by creating the impression that Chilton continues to exist as Nichols, and that the books published by Nichols are of the same quality as the market-leading Chilton publications.

Third, Nichols's telemarketing efforts are likely to mislead customers by implying that Chilton still exists today in the form of Nichols. The very phone number that callers must dial to reach a Nichols sales representative, "1–877–4CHILTON," creates the impression that the customer is calling Chilton, rather than Nichols Publishing. This impression is reinforced by the Farm Journal operators answering "Chilton Calling Center" when picking up a call, and by the sales representatives' identification of themselves as working with "Chiltons [sic] Automotive Repair Manuals." In addition, Nichols's telemarketing script describes Chilton as "an automotive tradition since 1925," implying that Chilton is an ongoing concern.

Finally, against the backdrop of Nichols's other misleading actions, the very title of Nichols's upcoming labor guide, "Chilton's Labor Guide Manual 1981–2000," is likely to mislead or confuse consumers as to the source of the product. The use of the Chilton name in the title, while permitted under the Nichols–Cahners agreement, is likely to mislead the consumer because it creates the impression that the Nichols Labor Guide is published by the Chilton company and is an updated version of the Chilton Labor Guide containing Chilton time. The use of "Chilton" in the title of the Nichols Labor Guide obscures the fact that the Nichols guide is a new entrant in the professional labor guide field and contains labor time estimates created by Nichols's editors.

This likelihood of confusion as to the source of the Nichols Labor Guide is exac-

erbated by Nichols's use of a design and colors similar to the Chilton Labor Guides for the cover of its new guide. Nichols's planned cover design, which incorporates the dark-green and orange colors identified with the Chilton Labor Guides as well as a cover layout similar to that of the Chilton books, reinforces the impression that Nichols's "Chilton Labor Guide 1981–2000" is a Chilton product and the authorized update to the guides published in previous years by Chilton and Motor.

All of these misleading representations are likely to affect the consumer's decision as to which labor guide to purchase. Because of the confusion created by Nichols's advertising and proposed title and cover design, the customer who wants to buy the latest version of the Chilton Labor Guide containing the industry-standard Chilton times would believe that Nichols's "Chilton's Labor Guide 1981–2000" is the product he or she wants. Nichols's "Chilton's Labor Guide" is *not* that product, however; it is not a Chilton product, it is not the labor guide that has been the market leader for several decades, and it does not contain original Chilton times.

In response to the false advertising and unfair competition claims, Nichols argues that any potential consumer confusion caused by Nichols's use of the Chilton name is defused by the explicit identification of Nichols Publishing as the publisher of the Chilton books in all of the promotional materials. Nichols claims that the inclusion of the Nichols name in every advertisement clearly distinguishes the difference between Nichols, the licensee of the Chilton mark, and Cahners, the company into which Chilton merged.

I find this argument to be unpersuasive. The manner in which Nichols is identified in the advertisements does not draw a sufficiently clear distinction between Nichols and Cahners. While it is true that most, if not all, of Nichols's advertisements for its Chilton publications include the Nichols Publishing name, the Nichols name generally appears in significantly smaller type and in a less prominent placement than the Chilton name. Moreover, most of the promotional materials mention the Nichols name only once or twice, while the Chilton name may appear as many as six or seven times. The inobtrusive and infrequent inclusion of the Nichols name is not enough to overcome the overwhelming confusion, described above, created by Nichols's deceptive use of the Chilton name.

## C. *Balancing of the Hardships*

Although Hearst's demonstration of a likelihood of success on the merits of its false advertising and unfair competition claims supports the award of injunctive relief, a brief discussion of the balancing of the hardships is warranted in considering what relief to fashion.

Hearst's efforts to enjoin Nichols from any use of the Chilton name in connection with its labor guide seem like a back-door attempt to gain through litigation what it could not obtain through negotiations with Cahners. There is no question that the right to use the Chilton name provides a competitive edge in the automotive publications market, for the automotive consumer associates "Chilton" with the accurate and trustworthy information published by Chilton for 75 years. Realizing this and hoping to retain the increased market share it had achieved when its Motor Labor Guide bore the Chilton name, Hearst attempted to negotiate an exclusive long-term license to use "Chilton" on its labor guides and other publications. When Cahners refused to sell those rights to Hearst, Hearst lost what limited right it had to use the Chilton name when its license expired. Cahners later granted an exclusive license to use "Chilton" on automotive publications to Nichols, which plans to market a competing professional labor guide bearing the Chilton name, capitalizing on the competitive edge the name provides.

If Nichols is prevented from exercising its right to put the Chilton name on its books, Hearst will receive an indirect benefit—the absence of the Chilton name from the marketplace in which its Motor Labor Guide competes. Hearst is, in essence, arguing that if it cannot use the Chilton name, no company can. I cannot agree. Cahners, the undisputed owner of the Chilton trademark and trade name, has the right to appoint licensees to use the mark, and Cahners has chosen to grant the exclusive right to the Chilton mark in the automotive repair market to Nichols.

On the other hand, Nichols's exclusive license does not give it license to mislead consumers as to the source or contents of its products in violation of federal law. Nichols is entitled to promote itself as the exclusive publisher of automotive repair books bearing the Chilton name, but it may not promote itself as the successor to the original Chilton Company and it may not represent that its labor guide contains original or updated Chilton time. Nichols is not Chilton; Nichols merely purchased the assets of one Chilton division before Chilton went out of business. Nichols's labor guide will not contain Chilton time; Nichols's labor times, created by former Chilton editors who now work at Nichols, are not "Chilton time." Hearst owns the copyrights to Chilton time, and therefore it has the exclusive right to publish that information in its Motor Labor Guide.

Furthermore, Nichols was aware that the professional automotive consumer strongly associated the Chilton name with the professional automotive manuals purchased by Motor in 1997. (Pl.Ex.8). Nichols has a contractual obligation to refrain from using the Chilton trademark "in any fashion which may cause confusion as to the source of [its] products." (Def.Ex.6, ¶ 2.6(c)). This obligation, in combination with Nichols's awareness of the professional consumer's tendency to associate "Chilton" with the professional manuals purchased by Motor, should have caused Nichols to be more careful about identifying its new professional labor guide as a product of Nichols Publishing, to defuse any potential consumer confusion. Nichols instead chose to capitalize on the market's association of the Chilton name with professional manuals and the resulting confusion in an attempt to boost sales of the Nichols Labor Guide.

Finally, Nichols raises equitable defenses in response to Hearst's application for injunctive relief, arguing that the doctrines of unclean hands and laches preclude any award of injunctive relief. I find these arguments to be unpersuasive, for the following reasons.

First, Nichols argues that Hearst's wrongful use of the Chilton name in its advertising and in the upcoming Motor Labor guide constitutes unclean hands. As the parties conducted only limited discovery in preparation for the preliminary injunction hearing and have not specifically briefed the issue of Hearst's right to use the Chilton name in its upcoming book, I reserve discussion of this issue for a later date. I am not persuaded at this juncture that Hearst is guilty of unclean hands.

Second, Nichols argues that Hearst's inexcusable delay in bringing legal action has resulted in extreme prejudice and harm to Nichols. I cannot conclude that Hearst's delay was unreasonable or that Nichols has been unfairly prejudiced as a result. As an initial matter, it is unclear precisely when Hearst first discovered that Nichols intended to entitle its manual "Chilton's Labor Guide 1981–2000." Nichols issued a press release to that effect sometime during the second quarter of 1999; Nichols's president testified that the press release was issued in May, but Nichols offered no additional proof to that effect. Motor's vice president claims not to have learned of the title until early August. In any event, Hearst waited until October to bring the instant action.

Some of Hearst's delay can be attributed to and excused by Hearst's attempts to resolve the dispute through non-litigious

means, contacting Nichols by letter in May and again in June to express its concerns about Nichols's advertising and to request that Nichols cease its conduct. Furthermore, in the three-month period after Nichols's hostile response to Hearst's concerns, Hearst discovered more information about Nichols's labor guide and surrounding advertising in increments, culminating in the Carr conversation with Ron the telemarketer on August 31, 1999. Under these circumstances, Hearst's delay in waiting until October 1 to institute legal action is not inexcusable. *See CBS, Inc. v. Liederman,* 866 F.Supp. 763 (S.D.N.Y. 1994), *aff'd* 44 F.3d 174 (2d Cir.1995) (per curiam); *Clifford Ross Co. v. Nelvana, Ltd.,* 710 F.Supp. 517, 521 (S.D.N.Y.1989).

Moreover, Nichols has not demonstrated undue prejudice resulting from the delay; Nichols has not "changed its position in a way that would not have occurred if the plaintiff had not delayed." *Conopco, Inc. v. Campbell Soup Co.,* 95 F.3d 187, 192 (2d Cir.1996). At the time of the hearing, Nichols was still in the process of preparing its book for publication. (Tr. at 103–04.). In the absence of undue prejudice and inexcusable delay, I will not apply the doctrine of laches. *See Conopco, Inc.,* 95 F.3d at 191 (courts should look to six-year statute of limitations for fraud in determining application of laches defense in Lanham Act false advertising case, and prior to the running of this analogous statute of limitations, burden is on defendant to prove that circumstances require application of laches); *Grant Airmass Corp. v. Gaymar Indus., Inc.,* 645 F.Supp. 1507, 1515 (S.D.N.Y.1986) ("Where the delay is shorter than the applicable statute of limitations, as here, the burden of proving the affirmative defense of laches rests with the defendant.... Before laches can be found, the defendant must show more than mere passage of time, but also that the delay was inexcusable and resulted in undue prejudice to the defendant.") (citations omitted).

## CONCLUSION

Accordingly, Hearst's motion for a preliminary injunction is granted in part and denied in part. Nichols is preliminarily enjoined from disseminating, in any manner or in any medium, any advertisement or promotional matter that claims, directly or by implication, that (a) Nichols is the same company as or is the direct successor to the former Chilton Company that was founded in 1922; (b) Nichols has been in the automotive publishing business for 75 continuous years; (c) the Nichols Labor Guide contains the original Chilton labor times created by Chilton prior to June 1997; (d) the Nichols Labor Guide contains updates of the original Chilton labor times created by Chilton prior to 1997; (e) from 1997 to 1999, Motor was not authorized to publish professional labor manuals under the Chilton name and specifically, that Motor was not authorized to publish Chilton labor times; (f) Motor does not own the copyrights to the original Chilton labor times created by Chilton prior to June 1997; (g) Motor's upcoming labor guide does not contain original Chilton labor times created by Chilton prior to June 1997; and (h) Nichols successfully sued Motor over Motor's use of the Chilton name, resulting in Motor settling the case or paying a sum to Nichols.

With respect to the title and appearance of the forthcoming Nichols Labor Guide, the Court is not inclined to enjoin all use of the Chilton name. On the other hand, the Court will not permit the use of the Chilton name unless reasonable steps can be taken to avoid the confusion detailed above. Accordingly, with respect to the title and appearance of the book, Nichols is preliminarily enjoined from representing, either directly or by implication, that its labor guide is the latest updated version of the original Chilton Labor Guide containing the Chilton labor times that have become the industry standard. The Court will hold a conference on December 1, 1999, at 2:00 p.m. to discuss the particulars of the relief with regard to the title and

appearance of the Nichols Labor Guide. The parties shall confer before then in order to attempt to agree on the scope of the injunction.