**RAMSEY GROUP, INC., a North Carolina corporation, Plaintiff,**

v.

**EGS INTERNATIONAL, INC., d/b/a Enviroguard; Douglas Frazier, an individual; Kenneth Cotton, an individual; and Expo Power Systems, Inc., a California corporation, Defendants.**

No. CIV. 1:02CV77.

United States District Court, W.D. North Carolina, Asheville Division.

April 22, 2004.

J. Derel Monteith, Jr., Carter & Schnedler, Asheville, NC, for Plaintiff, Consolidated Defendant, and Counter–Defendant.

Brian T. Racilla, Michael J. McKeon, Fish & Richardson, P.C., Washington, DC, for Plaintiff and Consolidated Defendant.

Wyatt S. Stevens, Roberts & Stevens, P. A., Asheville, NC, James G. Gatto, Michael C. Whitticar, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, Reston, VA, for Consoli-

dated Plaintiff, Defendant and Counter–Claimant.

Philip J. Smith, W. Carleton Metcalf, Van Winkle, Buck, Wall, Starnes & Davis, P. A., Asheville, NC, William A. Davis, Simeon Schopf, Mintz, Levin, Cohn, Ferris, Glvosky and Popeo, Washington, DC, for Defendant and Counter–Claimant.

James E. Doroshow, Allan S. Cohen, Kristine Michelle Blumensaadt, Stroock & Stroock & Lavan LLP, Los Angeles, CA, for Consolidated Defendant.

## MEMORANDUM OF OPINION

THORNBURG, District Judge.

**THIS MATTER** is before the Court on numerous motions and cross motions for summary judgment.

### I. PROCEDURAL HISTORY

On March 26, 2002, Plaintiff Ramsey Group, Inc. (Ramsey) initiated this action seeking declaratory judgments that it has not infringed United States Patent No. 6,308,728 B1 ('728) for a spill containment system and method and that the patent is invalid. The complaint also asserted a claim for unfair trade practices pursuant N.C. Gen.Stat. § 75–1.1. The Defendants in that action were EGS International, Inc., doing business under the name of EnviroGuard (EnviroGuard), Douglas Frazier (Frazier), the inventor of the '728 patent and majority shareholder of EnviroGuard, and Kenneth Cotton (Cotton), the president of EnviroGuard. According to the complaint, "Ramsey Group and Defendants are competitors in the field of designing, manufacturing, and selling products for containing spills of hazardous material from stationary industrial and commercial batteries such as those used in the telecommunications industry." **Complaint, filed March 26, 2002, at 3.**

On April 16, 2002, the Ramsey Group amended its complaint to delete an allegation that the corporate status of Defendant EnviroGuard had been suspended by the California Secretary of State. **Amended Complaint, filed April 16, 2002, at 2.**

On May 28, 2002, Defendants filed a "Statement of Non[-]Assertion of U.S. Patent No. 6,308,728 B1" in which the Defendants announced that

> [s]ubject to all jurisdictional objections which are specifically preserved, Defendants ... inform the Court that Defendants do not and will not assert U.S. Patent No. 6,308,728 B1, the patent-in-suit, against [Ramsey] with respect to the Uni–Seal containment system or any of Ramsey's products that Ramsey currently sells.

**Statement of Non[-]Assertion of U.S. Patent No. 6,308,728 B1, filed May 28, 2002.**[1]

On July 26, 2002, the undersigned granted Ramsey's motion for leave to file a supplemental amended complaint which added Defendants Expo Power Systems, Inc. (Expo) and Toni Frazier, Douglas Frazier's wife, and which added United States Patent No. 6,395,417 B1 (the '417 patent) to its request for declaratory judgments of non-infringement and invalidity. **Memorandum and Order, filed July 26, 2002.** Expo counterclaimed for a declaration of infringement. **Answer and Counterclaim, filed August 9, 2002.**

On October 16, 2002, this action was consolidated with *Expo Power Systems, Inc. v. Ramsey Group, Inc.,* Civil Case No.

---

1. The Federal Circuit has held that "a patentee defending against an action for a declaratory judgment of invalidity can divest the trial court of jurisdiction over the case by filing a covenant not to assert the patent at issue against the putative infringer." *Super Sack Mfg. Corp. v. Chase Packaging Corp.,* 57 F.3d 1054, 1058 (Fed.Cir.1995).

1:02cv202. **Order, filed October 16, 2002.** In that action, originally filed in California, Expo sought a declaration that Ramsey had infringed the '417 patent. **Memorandum and Order, filed August 27, 2003, at 4.**

On August 27, 2003, the undersigned granted the Plaintiff's motion for summary judgment as to Expo's claim of infringement of the '728 patent and dismissed Expo's counterclaim as to that patent. *Id.,* at 15. On September 3, 2003, the undersigned issued a claim construction decision as to the '417 patent. **Memorandum of Decision, filed September 3, 2003.** On October 6, 2003, Ramsey filed a dismissal of its claims against Toni Frazier. **Stipulated Dismissal of Claims against Defendant Toni Frazier, filed October 6, 2003.**

The parties have now filed motions and cross-motions for summary judgment on the issues remaining in the action. The Court finds no hearing is necessary for ruling on the pending matters.

## II. STANDARD OF REVIEW

■ A determination of infringement requires a two-step analysis. First, the claim must be properly construed to determine its scope and meaning. Second, the claim as properly construed must be compared to the accused device or process. In order for a court to find infringement, the plaintiff must show the presence of every ["element"] or its substantial equivalent in the accused device. Claim construction is an issue of law .... The determination of infringement, whether literal or under the doctrine of equivalents, is a question of fact.

*Ecolab, Inc. v. Envirochem, Inc.,* 264 F.3d 1358, 1364 (Fed.Cir.2001) (internal citations and quotations omitted). Expo's motion for summary judgment is limited to its allegation that Ramsey's Uni–Seal System literally infringes the '417 patent. "Literal infringement requires that every element of the invention as claimed is present in the accused device." *ACCO Brands, Inc. v. Micro Sec. Devices, Inc.,* 346 F.3d 1075, 1080 (Fed.Cir.2003). Ramsey's motion for summary judgment is based on the doctrine of equivalents. "Infringement by equivalents requires that the accused device contains elements identical or equivalent to each element of the claim." *Id.*

The issue, then, is whether a determination of infringement can be resolved by this Court without a jury.

[A grant of] summary judgment [is appropriate] when the record shows [there are] no genuine issues of material fact and entitlement to judgment as a matter of law [is proper] for the moving party. [In reviewing the record, the] court draws reasonable inferences from the evidence in favor of the non-mov[ing] [party]. Moreover an asserted issue of material fact is not "genuine" in the sense of Fed.R.Civ.P. Rule 56 if a reasonable jury could only resolve the question for the moving party. In assessing issues of material fact to determine whether a "reasonable jury" could disagree on them, [the] court identifies facts posing a potential dispute and then examines those facts in the context of the legal criteria by which a fact finder would resolve the dispute.... Infringement under the doctrine of equivalents requires an intensely factual inquiry. And, [the] court is well aware of the difficulty of granting summary judgment motions on issues requiring delicate balancing of many factual components. Ultimately [the] court may [grant] summary judgment of non-infringement under the doctrine of equivalents, where that doctrine is legally applicable, only if it discerns no genuine issues of material fact and that no rea-

sonable jury could find equivalence.... In this review, [the] court must examine the record for genuine issues of material fact and must determine that no reasonable jury could reach a different conclusion.

*Vehicular Tech. Corp. v. Titan Wheel Int'l, Inc.,* 212 F.3d 1377, 1381 (Fed.Cir.2000) (internal citations omitted).

## III. FACTUAL BACKGROUND

Douglas Frazier invented and patented the device claimed by the '417 patent. Frazier assigned all of his right, title and interest in the '417 patent to Expo. The '417 patent claims a battery spill containment system which may be used with stationary battery installations. Such installations provide a " 'stable source[ ] of continuous electrical power that function[s] independently of outside utility companies.' " **Memorandum of Decision, filed September 3, 2003, at 3 (quoting Plaintiff's Claim Construction Brief, filed April 18, 2003, at 2).** Stationary battery installations normally contain "one or more battery racks, each having one or more shelves, [ ] located in a room. The battery rack(s) are situated such that their shelves are substantially parallel to the floor and with sufficient space between the shelves to accommodate one or more batteries on each shelf." **Plaintiff Ramsey Group, Inc.'s Memorandum in Support of Cross–Motion for Partial Summary Judgment of Patent Noninfringement, filed September 24, 2003, at 6.** Stationary lead-acid battery systems are required by law to contain a liquid-tight spill-control barrier to prevent highly corrosive and toxic electrolytes from spilling or leaking and thus, causing damage to the surrounding people, property and environment. *Id.*

Ramsey manufactures and sells the Uni–Seal System which is also a battery acid containment system. That system uses a liner, barrier rails to contain the liner and a neutralizer to absorb leaked acid. Expo claims the Uni–Seal System infringes the '417 patent.

## IV. DISCUSSION

**A. Defendant Expo's motion for partial summary judgment on patent infringement, filed September 10, 2003, and Ramsey's cross-motion for partial summary judgment of patent noninfringement, filed September 24, 2003.**

Expo argues that Ramsey's products literally infringe the '417 patent. Claim 1 of the '417 patent reads:

A spill containment system for containing a spilled substance from a device, the spill containment system comprising: a plurality of containment rails that are resistant to damage from the spilled substance; a plurality of mounts that mount the plurality of containment rails to one another to define an area; a flexible liner placed within the area and having a base with a wall; a material placed within the area and on the liner which absorbs the spilled substance; and wherein the mounts permit the removal of at least one of the containment rails to expose the wall of the flexible liner so that the wall may be flexed.

**Exhibit 1, '417 Patent,** *attached to* **Ramsey Group's Memorandum in Support of Motion for Partial Summary Judgment of Patent Invalidity ["Ramsey's Memorandum of Patent Invalidity"], filed October 1, 2003, at Col. 10, ll. 59–67 to Col. 11, ll. 1–5.** The undersigned has construed Claim 1 as follows:

The "mounts" in the specification include several different devices including nails, screws, bolts, and even glue. The common component of all of these mounts is that they connect the contain-

ment rails to one another or to another object, such as the floor or a wall.... "[M]ounts" would mean "any devices used to connect the containment rails to one another." The verb "mount" is construed as "to connect the containment rails to one another or to another object." ... The procedure to remove the containment rails should not entail significant work or destruction of the containment rail system. Connectors such as nails, bolts, or glue would not allow for such removal, and, therefore, would not be considered "mounts" with regard to Claim 1. Connectors including screws that can be removed with a screwdriver, and corner mounts with slots for convenient removal would be considered "mounts." Claim 1, then, is construed as "*a plurality of any devices used to connect the containment rails to one another to define an area;*" and "*wherein these devices allow at least one of the containment rails to be removed, without damaging the containment rail system, in order to expose the wall of the flexible liner so that the wall may be flexed.*"

**Memorandum of Decision, at 8–9 (emphasis added).**

Ramsey argues that "because the corner joint screws in the Uni–Seal System—or more specifically, the removal thereof from any given barrier rail—do not 'allow at least one of the containment rails to be removed, without damaging the containment rail system,'" there is no literal infringement. **Ramsey Group's Memorandum in Support of cross-motion for Partial Summary Judgment of Patent Noninfringment and Response in Opposition to Expo's Motion for Partial Summary Judgment of Patent Infringement ["Ramsey's Memorandum of Patent Noninfringement"], filed September 24, 2003, at 15.** Among the allegations contained in the affidavit of John Egan, president of Ramsey, are the following:

The Uni–Seal System was designed for maximum practical structural strength, stability, and integrity, not for ease of removal of individual barrier rails.... [T]he Uni–Seal System consists of three primary elements: a spill barrier installed on the floor around the base of a battery rack; a liner placed in the spill barrier and snapped to the spill barrier to protect the spill barrier and the floor from spilled battery electrolyte; and packets of powder placed on the liner inside the spill barrier to absorb the spilled electrolyte[.] The spill barrier consists of at least four red barrier rails arranged to form a rectangular or square barrier. All of the barrier rails are bolted to the floor with lag bolts engaged with lag shields. Snap studs are oriented on each rail near the corner joints of the barrier and along the length, as needed, of the barrier. At the corners, the barrier rails are attached by screws to other barrier rails.

. . . . .

The barrier rails of the Uni–Seal System are attached to the floor by the lag bolts that are inserted through holes drilled in the horizontal legs of the "L" shaped barrier rails and threaded, using a torque wrench adjusted to provide 200 inch-pounds of torque, into the lag shields previously set into holes previously drilled into the floor. A lag bolt, sometimes referred to as a lag screw, is a bolt generally intended for use with a lag shield. A lag shield is an internally threaded sleeve featuring external ribs and a portion that is split along the length of the shield; as a lag bolt is threaded into a lag shield, the split portion of the lag shield expands, causing the ribs on the outside of the lag shield

to wedge into the material in which the shield has been previously inserted.

. . . . .

[T]he retainer tubes, the snaps, the lag bolts, and the corner joint screws must be removed or disengaged from a barrier rail of the Uni–Seal System in order for the barrier rail to be removed from the system.

. . . . .

One must perform numerous disassembly steps beyond mere removal of the corner joint screws to remove an individual barrier rail from the Uni–Seal System. Although these steps may be performed in varying orders, all of these steps must be performed for an individual barrier rail of the Uni–Seal System to be removed from the system.

**Exhibit 1, Affidavit of John J. Egan, attached to id., ¶¶ 10, 11, 13, 16.** Using a tool, one must remove the four corner joint screws. *Id.,* ¶ 16. Then, one must lift portions of the retainer tubes away from the barrier rail until one or more such tubes are removed from the barrier rail. *Id.* Next, the liner must be detached from the barrier rail by unsnapping the two or more snap studs from their sockets. *Id.* The detached portion of the liner must be held away from the barrier rail in order to expose the heads of one or more lag bolts which attach the rail to the floor. *Id.* While holding this portion of the liner, one must remove the lag bolts from the barrier rail and the lag shields previously set in the floor. *Id.*

Over one year prior to the date that Egan signed the above affidavit, he was deposed by the Defendants' attorney. **Exhibit 2, Partial Deposition Transcript of John J. Egan taken December 13, 2002, *attached to* Defendants' Combined Reply in Support of their Motion for Partial Summary Judgment on Patent Infringe-** ment, and Opposition to Plaintiff's cross-motion for Partial Summary Judgment of Patent Non–Infringement ["Defendants' Combined Reply & Opposition to Patent Non–Infringement"], filed October 8, 2003. During that deposition, Egan testified that if a customer needed a system to use with a battery rack longer than 10 feet, the Uni–Seal System could "very easily" accommodate that need "by making two sections of barrier that fit the length sides." *Id.,* at 50. Those two sections would be fastened together "[b]y a dual split pin joint." *Id.*

[T]he barrier section comes in intimate contact, the in face of the barrier section comes in intimate contact with the side face of the adjacent barrier. The joint is held together with two threaded fasteners that project completely through one piece, thread into the adjacent piece, forming a structurally robust joint.

*Id.,* at 51. "It is possible to remove the fastener from the joint." *Id.,* at 53. However, removal of the fasteners does not alone allow removal of a barrier rail because it is held in place "by a threaded fastener that goes into the floor." *Id.* This floor fastener can be removed with a socket wrench or open ended wrench. *Id.,* at 54. Once the floor fastener is removed, the barrier still cannot be removed unless the bladder and retainer tubes which sit on top of the barrier are removed. *Id.,* at 55. The retainer tube is easily removed from the bladder and the snaps are removable from the barrier without the use of a tool, *i.e.,* by human hand. *Id.* It is, however, possible to remove a barrier rail and replace it without harming the system if proper care is taken in handling the pieces and in refitting the joint when the threaded fasteners are re-screwed. *Id.,* at 56.

██ Despite this testimony, Ramsey has exaggerated the information contained in Egan's affidavit to allege that

[i]ndeed, the only way to remove a barrier rail from the Uni–Seal System after removing only the associated corner joint screws is to take the drastic measure of deliberately and extensively damaging at least the barrier rail and possibly other structure in the system by applying sufficient force to rip the barrier rail up from the floor and away from the liner without first removing and disengaging the lag bolts, snaps, and retainer tubes that continue to secure the barrier rail to both the floor and the liner after the corner joint screws have been removed.

**Ramsey's Memorandum of Patent Noninfringement, at 15.** The Court does not find that these claims are supported by either Egan's affidavit or deposition testimony. In fact, Egan clearly stated that the "mounts" which connect the barrier rails to one another can be removed so that a barrier rail may be removed or replaced. Although Ramsey focuses on the necessity of other steps to achieve that removal, the fact remains that it is possible. Neither Ramsey nor Egan has shown genuine issues of material fact. Where an expert's declaration contradicts previous sworn testimony, it is proper for the Court to strike or refuse to consider the same. *Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.,* 340 F.3d 1298 (Fed. Cir.2003). A party may not submit affidavits purporting to create genuine issues of fact if the affidavits contradict prior sworn testimony. *Id.; accord, Hernandez v. Trawler Miss Vertie Mae, Inc.,* 187 F.3d 432 (4th Cir.1999) (**The court may disregard an affidavit which is inherently inconsistent with deposition testimony**). The undersigned, therefore, declines to find that Egan's affidavit creates a genuine issue of material fact. And, since Ramsey's argument is based on that affidavit, it is rejected as well.

Moreover, in order to have literal infringement, it is not required that the barrier rails be removable only upon the removal of the corner fasteners. Claim 1 has been construed as "a plurality of any devices used to connect the containment rails to one another to define an area;" and "wherein these devices allow at least one of the containment rails to be removed, without damaging the containment rail system ...." **Memorandum of Decision,** *supra.* Egan's testimony clearly shows that mounts, as construed, are used to connect the barrier rails together regardless of whether or not those rails are also mounted to the floor. And, the mounts may be removed in order to allow removal of the barrier rail without destroying the integrity of the entire system. Indeed, the installation instructions provided by Ramsey clarify this issue: "It may be useful to remove sections of the barrier as the rack is installed and batteries placed on the rack. *Simply remove the retainer tube, unsnap the liner from the barrier and remove the corner screw from the section of barrier to be removed."* **Attachment 4 to Exhibit 5,** *attached to* **Ramsey's Memorandum of Patent Noninfringment, at R0119 (emphasis added).** The fact that additional steps may be required is of no consequence. The "mere addition of elements [in the accused product or process] cannot negate infringement." *Dow Chemical Co. v. Sumitomo Chemical Co., Ltd.,* 257 F.3d 1364, 1380 (Fed.Cir.2001) (quotation omitted); *Smith & Nephew, Inc. v. Ethicon, Inc.,* 276 F.3d 1304, 1311 (Fed. Cir.2001) (**"Infringement arises when all of the steps of a claimed method are performed, whether or not the infringer also performs additional steps."**). The undersigned finds that Expo has shown that the Uni–Seal System literally infringes Claim 1 of the '417 patent. Because literal infringement has been shown,

it is unnecessary to address infringement based on the doctrine of equivalents.

Expo also argues that Claims 5 and 6, which depend from Claim 1, are literally infringed. Claim 5 describes the "spill containment system ... wherein the liner is fabricated out of polyvinylchloride" and Claim 6 provides that "the material neutralizes the spilled substance." Ramsey has not alleged that the liner is not fabricated from polyvinylchloride; indeed, included in the installation procedures are instructions for repairing a puncture to the liner by using "PVC sealant" or "PVC cement." **Attachment 5 to Confidential Exhibit 6, *attached to* Defendants' Combined Reply & Opposition to Patent Non–Infringment, at R0096.** Polyvinyl chloride is "a polymer of vinyl chloride [having an] abbreviation [of] PVC." **Merriam–Webster Dictionary.** Moreover, Ramsey describes the system as using "packets of powder placed on the liner inside the spill barrier to absorb the spilled electrolyte" and specifically notes the "neutralizing and absorbing" features of the system in the installation manual. **Egan Affidavit, *supra;* Ramsey's Attachment 4 to Exhibit 5, *supra.*** Ramsey has not shown any evidence in opposition to Expo's motion for summary judgment as to these claims. The Uni–Seal System literally infringes Claims 5 and 6 which depend from Claim 1 and Expo's motion is granted.

Expo's motion for summary judgment was limited to Claims 1, 5, 6, 12 and 13. Ramsey moved for summary judgment as to Claim 9: "[t]he spill containment system of claim 1 wherein the containment rails are adjustable to form one of a plurality of dimensions." The Court construed this claim as: "[t]he spill containment system of claim 1 wherein the containment rails include structure that permits the containment rails to be adjusted to form one of two or more dimensions." **Memorandum of Decision, at 9–10.** In reaching this construction, the undersigned specifically rejected the Defendants' argument that this would include modifying existing rails, such as by cutting. "[T]he same containment rails would be used, but they would be set-up in a different shape." *Id.* This could be accomplished by the use of "a plurality of holes in the containment rails" as described in the patent's specification. *Id.*

Egan testified that if a customer needed a system to use with a battery rack longer than 10 feet, the Uni–Seal System could "very easily" accommodate that need "by making two sections of barrier that fit the length sides." **Egan Partial Deposition Transcript, at 50.** Those two sections would be fastened together "[b]y a dual split pin joint." *Id.* In fact, the installation procedures provides instructions for doing so.

> On larger systems, the length barrier section will have a split pin joint[.] To connect the pieces [-] align pieces in a straight line[;] align pin with the holes in the opposite face[;] with a rubber mallet or scrap piece of wood & hammer, pound on the opposite end of barrier section that has the pins installed[;] have a helper hold the receiving piece while driving pins in place[.]

**Defendants' Attachment 5 to Confidential Exhibit 3, at R0095.** Egan's testimony and the installation manual preclude Ramsey's request for summary judgment because both pieces of evidence clearly show that the containment rails may be adjusted by the use of holes through which the rails may be connected. Thus, Ramsey is not entitled to summary judgment of non-infringement as to Claim 9.

■ Claim 12 of the '417 patent provides for:

[a] battery storage system comprising the spill containment system of claim 1 and further comprising:

a battery rack located within the area defined by the containment rails and holding a battery;

a door mounted to the battery rack wherein one of the containment rails is removed and the wall of the flexible liner is flexed to permit the door to open.

**Memorandum of Decision, at 10.** The undersigned construed this claim as requiring "a door connected to the battery rack wherein one of the containment rails is removed and the wall of the flexible liner is moved or unfolded in such a way as to permit the door to open." *Id.*

It is not disputed that the Uni–Seal System does not contain a "door mounted to a battery rack" and Ramsey does not manufacture or sell battery storage systems or battery racks. Nor is it disputed that Ramsey sells the Uni–Seal System to facilities which have stationary battery storage installations and/or racks. Expo argues that because the Uni–Seal System, once sold and delivered to the customer, is capable of use with such a system having a door mounted to a battery rack, then the product literally infringes the patent when that occurs. Ramsey replies that this is insufficient to show literal infringement. The Court concludes that Expo cannot show literal infringement since the allegedly infringing device does not contain every element of Claim 12, *i.e.*, "a door mounted to the battery rack . . . ."

■ Ramsey also argues that Expo has not shown contributory infringement or the inducing of infringement by its manufacture and sale of the Uni–Seal System.

Inducement to infringe is defined by 35 U.S.C. § 271(b) which states that "[w]hoever actively induces infringement of a patent shall be liable as an infring-

er." In order to succeed on a claim of inducement, the patentee must show, first that there has been direct infringement, and second that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement. In other words, "[t]he [patentee] has the burden of showing that the alleged infringer's actions induced infringing acts *and* that he knew or should have known his actions would induce actual infringements.". . . The record [does not] indicate[ ] that [Ramsey] was aware of the ['417] patent[ ] and supplied the infringing products to . . . customers with instructions on how they were to be used, which, when followed, would lead to infringement.

*Minnesota Min. & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1304–05 (Fed.Cir.2002) (quoting *Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 553 (Fed. Cir.1990)) **(other internal quotations and citations omitted);** *accord Anton/Bauer, Inc. v. PAG, Ltd.*, 329 F.3d 1343, 1348 (Fed.Cir.2003); *Warner–Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1363 (Fed. Cir.2003) (**"However, that defendants have knowledge of the acts alleged to constitute infringement is not enough. [P]roof of actual intent to cause the acts which constitute the infringement is a necessary prerequisite to finding active inducement.") (quotations omitted).** Expo has not shown that any customer actually infringed the patent and, therefore, the first prong of induced infringement has not been established.

" 'Although not direct infringement under 35 U.S.C. § 271(a), a party's acts in connection with selling equipment may, however, constitute . . . contributory infringement of a . . . claim[.]' " *RF Delaware, Inc. v. Pacific Keystone Tech., Inc.*, 326 F.3d 1255, 1267 (Fed.Cir.2003) (quot-

ing *Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770, 775 (Fed.Cir.1993)). "In the event that direct infringement exists, [Ramsey] could also be found liable for contributory infringement if it knows the products to be 'especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use.'" *Id.* (quoting 35 U.S.C. § 271(c)). Again, however, Expo has not proffered proof that any of Ramsey's customers use the Uni–Seal System in an infringing manner. "'It is not ... the task of the district court, to attempt to interpret confusing or general testimony to determine whether a [claim] has been made out, particularly at the summary judgment stage.'" *Globetrotter Software, Inc. v. Elan Computer Group, Inc.*, 362 F.3d 1367, 1378 (Fed.Cir.2004) (quoting *Schumer v. Lab. Computer Sys., Inc.*, 308 F.3d 1304, 1316 (Fed.Cir.2002)). The evidence must "address specific alleged acts of infringement and inducement, not conjectures as to what might occur hypothetically." *Id.*, at 1380–81. As a result, Expo is not entitled to summary judgment of infringement as to Claim 12. Because the same reasoning applies to Claim 13, Expo is likewise not entitled to summary judgment.

To summarize, Expo's motion for partial summary judgment on patent infringement is granted as to Claims 1, 5 and 6 and is denied as to Claims 12 and 13. Ramsey's motion for partial summary judgment on patent non-infringement is denied as to Claims 1, 5, 6, 9, 12 and 13.

**B. Ramsey's motion for partial summary judgment of patent invalidity, filed October 1, 2003, and Defendants' motion for partial summary judgment of patent validity, filed October 3, 2003.**

Ramsey seeks a declaration that Claims 1, 5, 6 and 9 of the '417 patent are invalid as anticipated pursuant to 35 U.S.C. § 102 and/or as obvious pursuant to 35 U.S.C. § 103 and that Claims 12 and 13 are invalid as indefinite pursuant to 35 U.S.C. § 112. In other words, Ramsey argues the patent is invalid in light of the prior art.

▉ It is first noted that an issued patent enjoys a statutory presumption of validity and the burden of proving invalidity by clear and convincing evidence is on the party seeking to invalidate the patent. *Q–Pharma, Inc. v. Andrew Jergens Co.*, 360 F.3d 1295 (Fed.Cir.2004); *Abbott Labs. v. Baxter Pharm. Products, Inc.*, 334 F.3d 1274, 1282 (Fed.Cir.2003).

> A determination that a patent is invalid as being anticipated under 35 U.S.C. § 102 requires a finding that "each and every limitation is found either expressly or inherently in a single prior art reference." To anticipate, the reference must also enable one of skill in the art to make and use the claimed invention.

*Transclean Corp. v. Bridgewood Servs., Inc.*, 290 F.3d 1364, 1370 (Fed.Cir.2002) (quoting *Celeritas Techs. Ltd. v. Rockwell Int'l Corp.*, 150 F.3d 1354, 1360 (Fed.Cir. 1998)); *Toro Co. v. Deere & Co.*, 355 F.3d 1313, 1319 (Fed.Cir.2004).

On October 27, 1999, Frazier filed his application for the '728 patent. Included among the claims of that patent were Claim 1 which included "a flexible liner placed within the area defined by each of the plurality of containment rail systems to make each containment rail system resistant to damage from spilled substance" and Claim 5, "[t]he spill containment system of claim 1 wherein the liner is fabricated out of polyvinylchloride." **Exhibit 1, '728 Patent at Col. 9, ll. 67–68 to Col. 10, 11.1–2, 16–17,** *attached to* **Complaint.** When the patent examiner reviewed

the '417 patent, he granted as the priority date the date of the application for the '728 patent. **Exhibit 1, '417 Patent, *attached to* Ramsey's Memorandum of Patent Invalidity ("Continuation-in-part of application No. 09/428,192, filed on Oct. 27, 1999, now Pat. No. 6,308,728.").** This decision is presumed to be correct. *Applied Materials, Inc. v. Advanced Semiconductor Materials America, Inc.,* 98 F.3d 1563, 1569 (Fed.Cir.1996). Section 102(b) provides that an applicant is entitled to a patent unless "the invention was patented or described in a printed publication ... or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States." Thus, the issue is whether the continuation-in-part application is entitled to the priority date of October 27, 1999, which means that all prior art must predate October 27, 1998.

The ['417] patent issued from an application continued in part from the ['728] application. A CIP [continuation-in-part] application contains subject matter from a prior application and may also contain additional matter not disclosed in the prior application. Different claims of such an application may therefore receive different effective filing dates. Subject matter that arises for the first time in the CIP application does not receive the benefit of the filing date of the parent application. Thus, the decision on the proper priority date-the parent application date or the CIP application date-for subject matter claimed in a CIP application depends on when that subject matter first appeared in the patent disclosures. To decide this question, a court must examine whether the "disclosure of the application relied upon reasonably convey[s] to the artisan that the inventor had possession at that time of the later claimed subject matter."

*Augustine Med., Inc. v. Gaymar Indus., Inc.,* 181 F.3d 1291, 1302 (Fed.Cir.1999) (quoting *Waldemar Link v. Osteonics Corp.,* 32 F.3d 556, 558 (Fed.Cir.1994)) (other quotations and citations omitted). The only subject matter added to the '417 patent relates to the "door mounted to the battery rack wherein one of the containment rails is removed and the wall of the flexible liner is flexed to permit the door to open." **Exhibit 1, '417 Patent at Col. 12, ll. 14–16, *attached to* Ramsey's Memorandum of Patent Invalidity.** The '728 patent contains multiple references to a "flexible liner" made of polyvinylchloride with walls. **Exhibit 1, *attached to* Complaint, *supra*.** Thus, with the exception of the new subject matter, the Defendants are entitled to the priority date of the parent application and prior art is limited to that in existence prior to October 27, 1998.

Ramsey cites as prior art a solar-charged battery installation system for residential use built and sold in June 1997 by Independent Power & Light (IPL), a publication of the Minnesota Pollution Control Agency (Minnesota agency) dated August 1987, containment systems sold by the Defendants, Acran, Inc. (Acran), Calicorp, Inc. (Calicorp), and Yuasa–Exide, Inc. (Yuasa), and numerous patents for spill containment devices.

Egan, Ramsey's president, testified that when he first began to consider manufacturing a spill containment system at some point in the 1990's, the state of art was as follows:

There was a barrier that went around the perimeter. The liquid tight seal of the container volume relied on an acid resistent coating on the floor and gluing the barrier to the floor and the neutralizing and absorbing medium inside the containment system was a granular ma-

terial that was normally housed inside a fabric.

**Exhibit 18, Partial Deposition Transcript of John J. Egan, dated December 13, 2002, *attached to* Defendants' Memorandum in Support of Motion for Partial Summary Judgment on Validity ["Defendants' Memorandum on Patent Validity"], filed October 3, 2003, at 15.** Egan testified that at this time, Ramsey did not consider using a bladder or liner within the perimeter. *Id.,* at 16. The system was unsatisfactory to Egan because it relied on three elements: the glue used to attach the barrier to the floor, the barrier material, and the acid resistant floor covering. *Id.,* at 16–17. The barrier as glued to the floor restricted the maintenance personnel from access to the batteries. *Id.* If the floor was cracked, a tight seal could not be achieved. *Id.,* at 18. And, the glue itself caused problems because the barrier material being used at the time was stainless steel stamped onto the floor. *Id.,* at 18–19. In existence at the time was the Acran containment system which had a similar design. *Id.,* at 20. None of the systems in existence used a bladder or liner material. *Id.,* at 20–21. Although dissatisfied with each of the existing systems, Egan did not actively design a new one because he thought that Article 64 of the Uniform Fire Code, which required a "liquid-tight 4–inch ... spill-control barrier which extends at least 1 inch ... beyond the battery rack in all directions," might be repealed. *Id.,* at 22–23; **Exhibit 4, 1995 Supplement to The Uniform Fire Code of Exhibit E *contained in* Appendix to Plaintiff's Memorandum in Opposition to Defendants' Motion to Compel Discovery ["Plaintiff's Appendix"], filed August 1, 2003.**

**Article 64 was enacted in either 1994 or 1995. Egan Deposition, at 28.**

Ramsey began to aggressively design a containment system in 1998 or 1999 and first introduced the Uni–Seal Containment system in April 2001. *Id.,* at 25, 29. Instead of using stainless steel for a barrier, the system uses barriers made of fiberglass and resin. *Id.* The first battery spill containment system which used a bladder was the one manufactured by Enviroguard, which is owned by the Defendants. *Id.,* at 31. Egan testified that he first heard about it from an acquaintance who had seen the product at a trade show. *Id.,* at 32–33. As a result of that conversation, he began to look for a material which could be used as a bladder. *Id.* He found the material which is currently used in the system sometime during the year 2000. *Id.,* at 35. The bladder is used to seal the total containment volume, "not only the floor but also up the walls of the barrier." *Id.,* at 36.

Frazier, the inventor and original owner of the '417 patent, testified that the first time a customer asked for a spill containment system was in 1994 or 1995. **Exhibit 7, Partial Deposition Transcript of Douglas Frazier, dated February 20, 2003, *attached to* Ramsey's Memorandum of Patent Invalidity, at 28.** When Acran would not sell its system to Frazier, he determined to design his own system in either 1996 or 1997. *Id.,* at 29. The major difference between the spill containment systems designed by Frazier and those in existence at the time was that in 1999 he added the use of a PVC acid resistent liner.[2] *Id.,* at 50–52.

In April 1997, IPL provided a quote to a homeowner in Vermont for a "Photovoltaic Electric System Design/Estimate." Ex-

---

2. The Court rejects Ramsey's argument that the Defendants' early systems were prior art both substantively and by virtue of the filing date of the '728 patent application.

hibit 5, *attached to* Ramsey's Memorandum on Patent Invalidity, at 000002.

> The batteries should be contained in a sturdy box that is vented to the outdoors. Homeowner is to supply this box. Or I could build and supply this box for you for an extra fee. . . . The box should be very sturdy as it will have to hold a lot of weight for many years. It also should be placed on a platform about two feet high so as to bring the batteries off the floor and also place them at a height that is easier to work with. *The box should be lined with two layers of poly cloth for protection against spills or leaks.*

*Id.,* at 000002–03. There is no specification in the quote for the cloth to be provided by IPL; the underlined portion of the above quote appears to be a suggestion to the homeowner. And, as noted below, the plastic sheets are not flexible, formed liners. The estimate is for a solar-charged battery system to provide electricity to residences remotely located from standard electrical grids. Kenneth Cotton, an individual who worked with Frazier, testified that in 1991 or 1992, Frazier designed a spill containment system for a customer which differed from the Acran system in that Frazier's system both neutralized and absorbed the spilled acid. **Exhibit 8, Partial Deposition Transcript of Kenneth Cotton, dated February 19, 2003, *attached to* Ramsey's Memorandum on Patent Invalidity, at 44.**

As of February 1998, Calicorp manufactured a steel spill containment system for battery rooms. **Exhibit B, *attached to* Exhibit 2, Supplemental Expert Report of Bruce H. Dick, *attached to* Defendants' Memorandum on Patent Validity, at R001070.**

> Our spill containment barrier kits are constructed of 4–inch high steel and can be custom-fitted to each battery rack.

The kits can easily be placed around existing racks without service interruption and also be added during a new installation or growth job. The barriers are installed to the floor of the battery room and extend at least one-inch beyond the battery rack in all directions. The unique grey finish resists sulfuric acid concentrations up to 98 percent. This high-acid concentration resistent finish is important. If an electrolyte spill goes unnoticed, the water in the electrolyte can evaporate causing the sulfuric acid ratio to increase. When spill barriers are properly installed *along with acid-resistant floor coatings,* a liquid-tight, acid-resistent containment reservoir is created that meets the requirements of the Uniform Fire Code.

*Id.,* at R001070–71 (emphasis added). This system did not use a liner/bladder but instead relied on the floor's epoxy coating earlier described. The system sold by Calicorp in 1999 also did not rely on a liner/bladder. *Id.,* at R001111.

In 1996, Yuasa manufactured a containment system which used 1/4" thick PVC as a barrier which was cut with a hacksaw. **Exhibit 7, Yuasa–Exide Spill Containment System, *attached to* Exhibit E *contained in* Plaintiff's Appendix, at R0563.** Absorbing pillows were placed on top of the barrier. *Id.* Yuasa described its product as follows:

> In case of a catastrophic failure of a cell jar, the [Yuasa System] will neutralize and absorb electrolyte which comes in contact with the patented absorption pillows. Further, free flow of electrolyte to other areas of the battery room will be prevented by the 4–inch deep noncorrosive barrier which is sealed and mounted to the floor.

> . . . . .

> The [Yuasa] barrier is constructed of 1/4"-thick, 28 LOI (Limited Oxygen In-

dex) PVC that snaps together and cuts easily with a hacksaw.

*Id.* Thus, the Yuasa system used PVC for a barrier which was mounted to the floor. There is no use in that system of a flexible liner, whether made of PVC or other material. **Exhibit 4, Rebuttal Expert Report of Robert Robbins, Jr.,** *attached to* **Ramsey's Memorandum of Patent Invalidity,** at 3. "The use of a flexible liner was absolutely novel and to the best of my knowledge had never been demonstrated, seen, known, or even discussed within the industry for an industrial battery application prior to the Frazier patents." *Id.,* at 5.

On October 3, 1995, United States Patent 5,454,195 was issued to Jeffrey A. Hallsten for

a modular containment system, primarily for secondary containment of potentially hazardous materials, includes a series of interconnectable berm members which can be interlocked together to form virtually any desired containment perimeter. A sheet of flexible plastic material is laid over the containment area, and extends over the shoulders of the perimeter structure as a liner for the containment area. The liner is secured to the top of the perimeter structure, such as by a snap-in-tube arrangement. For high stability of the perimeter structure, the modular berm members are hollow, formed of plastic material, [and are] to be filled with water or sand, as well as having a low, wide profile.

**Exhibit 11, U.S. Patent 5,454,195,** *attached to* **Exhibit E of Plaintiff's Appendix,** at R0589. The liner disclosed in this patent was a sheet-like material, not a formed liner having independent walls. Robbins Rebuttal Report, supra, at 5. Moreover, the walls were penetrable, even after filled with water or sand. *Id.,* at 7.

In June 1997, the Minnesota Pollution Control Agency issued Hazardous Waste Division Fact Sheet # 4.06 entitled "Spent Lead–Acid Batteries—Requirements for Generators." **Exhibit C,** *attached to* **Dick Supplemental Expert Report,** *supra,* at MIN000001–02. The sheet contained "Helpful Hints" which included using "[a] wooden frame lined with heavy polyethylene" to store spent batteries. *Id.* The same suggestion was contained in Fact Sheet # 1.09 issued in January 1995 by the Agency. *Id.,* at MIN000005–06. Although allegedly earlier fact sheets have been included in the exhibit, the documents are illegible. The document, however, is relegated to the storage of spent batteries and does not discuss any application to battery installations which are in use. **Robbins Rebuttal Expert Report,** *supra,* at 7.

On February 25, 1992, U.S. Patent 5,090,588 issued to Edward W. Van Romer for a "portable containment for chemicals" device "for field use in containing pesticides and other toxic chemicals and the like" which included "a floor and integral side walls" which would allow a vehicle or aircraft to roll on and off of the containment "in the field" without spilling the leaked substance. **Exhibit D, U.S. Patent 5,090,588,** *attached to* **Dick Supplemental Expert Report,** *supra,* at 001180. The patent claimed "a floor composed of sheet material[.]" *Id.,* at R001186, Col. 5, 11. 33. On May 31, 1994, U.S. Patent 5,316,175 issued to Van Romer for a "foldable spill collector container." **Exhibit E, U.S. Patent 5,316,175,** *attached to id.,* at R00173. It also claimed "a floor composed of sheet material." *Id.,* at R001178, Col. 5, ll. 39. Neither patent discloses the use of a formed, flexible liner made of PVC. Both patents relate to a portable device which could be moved to the location of the aircraft or vehicle.

On September 7, 1999, U.S. Patent 5,948,250 issued to Dennis G. Middleton for a "filter berm" which included "a[n] impervious flexible synthetic floor which has a berm wall formed about its periphery[.]" Exhibit F, U.S. Patent 5,948,250, *attached to id.*, at R001257. "The berm functions to stabilize and hold by adsorption or absorption hydrocarbons while allowing water to pass out." *Id.*, at R001262, Col. 1, 11. 5–7. Other patents have been cited by Ramsey as prior art, including one for a disposable flexible liner for paint trays, and a "hazardous material containment and storage unit" comprised of "a basin in which a plurality of molded plastic pods are positioned." *See* **Exhibits G and J,** *attached to id.***,** at R001265, R001270.

Robert Robbins, Jr., is the chief executive officer of Acran. **Exhibit 11, Rebuttal Expert Report of Robert Robbins, Jr.,** *attached to* **Defendants' Memorandum on Patent Validity, at 2**. The prior art related to industrial battery installations include the products manufactured by Acran as well as Calicorp and Yuasa–Exide. *Id.*, at 3. "[N]one of the companies doing relevant work had anything that resembled a flexible liner." *Id.* The prior art using a liner involves applications having nothing to do with commercial battery installations, such as the solar-charged battery installations sold by IPL for residential use and the Minnesota agency fact sheet. *Id.*

As the V[ice] P[resident] of Marketing and subsequently the CEO of Acran, I was in daily contact with aspects of manufacturing, marketing, engineering and installation of spill control products both inside and outside of Acran. Such associations would have come from our direct sales, sales through a nationwide distribution network and work done in conjunction with code and regulation bodies. Yet, despite this environment, I did not conceive of the use of a flexible liner system for spill control and to the best of my knowledge, nor did anybody else short of Mr. Frazier. If the art were so "deep and rich" and if the concept of a flexible liner was so obvious, then why did 11 years lapse between the birth of spill containment as a commodity product and the filing of the Frazier patents?

*Id.*, at 3–4. Moreover, in "every application that [Ramsey] cites for previous art, the liner used is merely a sheet of plastic or some other sort of sheet-like material. None of the examples cited have anything resembling a formed liner that has a clear, independent structure of base and walls as described in the Frazier patents." *Id.*, at 5. The system built by IPL was a residential application of a vented battery box using materials which would not be acceptable or adequate in an industrial setting. *Id.*, at 6. The information contained in the fact sheets published by the Minnesota agency involve spent lead-acid batteries, not batteries which are still in use. *Id.*, at 7. Again, the materials suggested would not be acceptable or adequate in an industrial setting. *Id.*

IPL is a sole proprietorship owned by David Palumbo which has no employees. **Exhibit 15, Deposition of David Palumbo,** *attached to* **Defendants' Memorandum on Patent Validity, at 26**. He designs and sells solar-charged battery systems solely for residential use. *Id.*, at 30–31, 34, 48. When designing a system which requires large batteries, some of which weigh as much as 130 pounds, he designs it in such a manner that the front cover can be removed to access the batteries. *Id.*, at 33. He lines the wooden battery box with polyethylene cloth, which he purchases from Ace Hardware, and then uses roofing strapping to hold the batteries. *Id.*, 30–36,

41, 56. It was his practice to sprinkle baking powder on the plywood; however, once he began to line the boxes with cloth, he no longer used the baking powder. *Id.*, at 39–40. He does not use battery racks in his design systems and has never placed a rack within one of his systems. *Id.*, at 53, 59. The walls of his systems are not adjustable because they are customized for the specific size of batteries to be used by his customer. *Id.*, at 56–57. There is also no component in his system to detect a spill. *Id.*, at 58.

 "In order to ... 'anticipate' an invention, it is necessary that all the elements of the invention or their equivalents be found in one single description or structure where they do substantially the same work in substantially the same way." 1 ***Lipscomb's Walker on Patents*, § 4:4 (3d ed.).** "Under 35 U.S.C. § 102, a claim is anticipated, and therefore invalid, when a single prior art reference discloses each and every element of the claimed invention," and "if the prior art reference fails to suggest even one limitation of the claimed invention, then the claim is not anticipated." *Kemin Foods, L.C. v. Pigmentos Vegetales del Centro A.A. de C.V.,* 240 F.Supp.2d 963, 969 (S.D.Iowa 2003), *rev'd on other grounds*, 93 Fed.Appx. 225, 2004 WL 542193 (Fed.Cir.2004) (citations omitted). "A claim limitation is inherent in the prior art if it is necessarily present in the prior art, not merely probably or possibly present." *Akamai Tech. Inc. v. Cable & Wireless Internet Services, Inc.,* 344 F.3d 1186, 1192 (Fed.Cir.2003). Despite Ramsey's protestations to the contrary, there is not a single instance in the prior art of a device which uses a flexible liner "placed within the area and having a base with a wall" which also allows removal/replacement of the barrier by the exposure of the wall of the flexible liner in order to flex the wall. Ramsey's motion for summary judgment of invalidity is therefore denied.

 Next, Ramsey argues that the '417 patent is invalid because it was "obvious."

A claimed invention is unpatentable due to obviousness if the differences between it and the prior art "are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art." While the ultimate conclusion of obviousness is for the court to decide as a matter of law, several factual inquiries underlie this determination. These inquiries include the scope and content of the prior art, the level of ordinary skill in the field of the invention, the differences between the claimed invention and the prior art, and any objective evidence of nonobviousness such as long-felt need and commercial success.

*Id.*, at 1195–96 (quoting 35 U.S.C. § 103(a)) (other citations omitted). Moreover, "evidence of copying is relevant to an obviousness determination." *Id.*, at 1196.

In making the assessment of differences, section 103 [of Title 35] specifically requires consideration of the claimed invention "as a whole." Inventions typically are new combinations of existing principles or features. The "as a whole" instruction in title 35 prevents evaluation of the invention part by part. Without this important requirement, an obviousness assessment might break an invention into its component parts (A + B + C), then find a prior art reference containing A, another containing B, and another containing C, and on that basis alone declare the invention obvious. This form of hindsight reasoning, using the invention as a roadmap to find its prior art components, would discount

the value of combining various existing features or principles in a new way to achieve a new result-often the very definition of invention.

*Ruiz v. A.B. Chance Co.,* 357 F.3d 1270, 1275 (Fed.Cir.2004). Ramsey's arguments, however, are nothing more than breaking the invention into its component parts in order to find prior art references. The spill containment system made by Yuasa, it argues, "contains all of the limitations of the spill containment system claimed in Claim 1 of the '417 patent *except the flexible liner.*" **Ramsey's Memorandum on Patent Invalidity, at 18.** Because other companies manufactured systems using battery electrolyte absorption and neutralization mats, Ramsey argues that the other claims of the '417 patent are also obvious. "All three of these systems were only missing the flexible liner and the mounts that mount the containment rails to one another and permit the removal of at least one of the rails to expose the wall of the liner so that the wall may be flexed." *Id.,* at 20.

Section 103 precludes this hindsight discounting of the value of new combinations by requiring assessment of the invention as a whole. T[he Federal Circuit] has provided further assurance of an "as a whole" assessment of the invention under § 103 by requiring a showing that an artisan of ordinary skill in the art at the time of the invention, confronted by the same problems as the inventor and with no knowledge of the claimed invention, would select the various elements from the prior art and combine them in the claimed manner.

*Ruiz,* 357 F.3d at 1275–76. Considering all examples of the prior art cited by Ramsey, including the Defendants' own prior systems, no example contained a formed PVC liner with walls which could be flexed

in order to allow the easy removal or insertion of spill containment barriers. "The subject containment system consists of a 4 inch deep, prefabricated 80 mil thick polymeric liner container, mounted on the floor beneath a rack assembly of sealed or flooded type lead acid batteries. The liner is a two-layer filled PVC composite." **Exhibit 17, Underwriters Laboratories, Inc. Report,** *attached to* **Defendants' Memorandum on Patent Validity, at E000234, E000237, E000939, E000941–42, E000947 (describing each of the Defendants' products).** Moreover, Egan, who admitted that he did not consider using a flexible liner, now markets his products touting that very quality.

> Plainly, the use of a flexible liner as a spill control system in an industrial battery application was a unique invention of Mr. Frazier that exhibited a skill in the art that was extraordinary to him and him alone. This is made obvious by the lack of the development of such a product for the many years by the many people who would have at a minimum been classified as a person of ordinary skill in the art.

**Robbins Rebuttal Expert Report,** *attached to* **Ramsey's Memorandum of Patent Invalidity, at 4.** The Court, therefore, rejects Ramsey's claims that the '417 invention, as a whole, was obvious.

Ramsey's final arguments are that Claims 12 and 13 of the '417 patent are invalid because they are indefinite. The second paragraph of § 112 provides that a specification "shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." Claims 12 and 13 of the patent provide:

> A battery storage system comprising the spill containment system of claim 1 and further comprising:

a battery rack located within the area defined by the containment rails and holding a battery;

a door mounted to the battery rack wherein one of the containment rails is removed and the wall of the flexible liner is flexed to permit the door to open.

The battery storage system of claim 12 wherein after closing the door, the wall of the flexible liner is flexed back to its original position and the removed containment rail is remounted to the other containment rails.

Exhibit 1, '417 Patent, at Col. 12, ll. 10–20, *attached to* Ramsey's Memorandum of Patent Invalidity. According to Ramsey, "These claims clearly require and recite a series of acts to be performed to use the claimed battery storage system, which is improper and renders the claims indefinite[.]" Ramsey's Memorandum, at 23. In other words, the claims are apparatus claims which are invalid because they actually recite a method of using the invention.

 "The determination of whether a claim is invalid as indefinite 'depends on whether those skilled in the art would understand the scope of the claim when the claim is read in light of the specification.'" *Intellectual Prop. Dev., Inc. v. UA–Columbia Cablevision of Westchester, Inc.,* 336 F.3d 1308, 1319 (Fed.Cir.2003) (quoting *N. Am. Vaccine, Inc. v. Am. Cyanamid Co.,* 7 F.3d 1571, 1579 (Fed.Cir. 1993)). Ramsey has not cited any evidence, nor has the Court found any in the record, that one skilled in the art would not understand the scope of the claim read in light of the specification. Summary judgment is, therefore, inappropriate.

In summary, Ramsey's motion for partial summary judgment of invalidity is denied. The Defendants' motion for partial summary judgment of validity is granted.

**C. Ramsey's motion for partial summary judgment of patent unenforceability, filed October 1, 2003, and the Defendants' cross-motion for partial summary judgment of enforceability, filed October 3, 2003.**

Ramsey claims that "Douglas Frazier and his patent attorney, David E. Wang, engaged in an incredulous pattern of bad acts before the Patent Office in procuring the '417 patent" by withholding "highly material prior art." Ramsey's Memorandum in Support of Motion for Partial Summary Judgement of Patent Unenforceability ["Ramsey's Memorandum"], filed October 1, 2003, at 1. According to Ramsey, Frazier and Wang intentionally failed to disclose to the patent examiner as prior art information about the Acran and Yuasa spill containment systems, as well as the Defendants' own systems. "Nor did they properly disclose the existence and requirements of the Uniform Fire Code." *Id.,* at 2.

It is undeniable that Frazier and Wang were aware of and failed to disclose highly material prior art and other information that related to patentability.... And now, faced with the prospect of having his flagrant misdeeds fully exposed and having his client's improvidently granted patents rendered unenforceable, Wang has refused to be deposed and has even moved to quash Ramsey's deposition subpoena[.]

*Id.,* at 3.

As proof of these vitriolic allegations, Ramsey attached the "Information Disclosure Statement under 37 C.F.R. §§ 1.97–1.98," dated October 17, 2000, which was filed in connection with the application for the '417 patent. Exhibit 1, *attached to* Ramsey's Memorandum, at R001021. Attached to that Statement was "Form PTQ–1449" captioned, "List of Patents and

Other Items for Applicant's Information Disclosure Statement." *Id.,* at R001023. The document discloses that Frazier listed eight United States patent documents, no foreign patent documents and no other published documents. *Id.* Among the "Reasons for Allowance" cited by the patent examiner are the following:

> the instant claims are allowable over the prior art of record, because *the prior art is silent to a spill containment system described in claim 1.* The prior art, such as Miller U.S. Patent 5,140,744 teaches a modular rack, but is silent to means for containing a spill as described in Claim 1.

*Id.,* at R001026 (emphasis added). This application was a continuation-in-part of the '728 patent. The application for the '728 patent also contained an Information Disclosure Statement. **Exhibit 5, *attached to* Ramsey's Memorandum.** Frazier disclosed eight United States patents documents, no foreign patent documents and no other published documents in that application. *Id.,* at R000817. The prosecution history of the '728 patent shows that Claim 1 was originally rejected "as being unpatentable over Thomas." *Id.,* at R000820. One reason noted by the examiner was that "[t]he type of plastic material that the liner 82 of Thomas is made out of is matter of obvious design expedient." *Id.* Frazier's attorney responded that "Thomas does not appear to disclose a 'flexible liner' placed within the area of the containment rail system." *Id.,* at R000829. "At a minimum, the prior art does not have all three features of the claimed spill containment system; namely a system which (1) contains leaks from a *battery;* (2) has a material that *absorbs and chemically neutralizes* the spilled substance from the battery; and (3) has a *flexible* liner." *Id.,* at R000830. Obviously, the '728 patent did ultimately issue.

Frazier, and his attorney, disclosed in the "Background of the Invention" section for both patents that "Article 64 of the Uniform Building Code requires a four-inch high containment barrier with an acid neutralization capability[.]" **Exhibit 8, '728 Patent at Col. 1, ll. 21–25, *attached to* Ramsey's Memorandum.**

Ramsey also attached a copy of Wang's brief in support of his motion to quash a deposition subpoena served on him by Ramsey's attorneys. Wang notes that the subpoena was in violation of the Pretrial Order and Case Management Plan issued by the undersigned which provided for no more than ten depositions. **Exhibit 6, Motion of David E. Wang to Quash Subpoena, filed in the Central District of California, *attached to* Ramsey's Memorandum, at 3.** Wang's deposition would have been the twelfth. *Id.* In addition, Wang quite properly noted that, as counsel for Frazier, his testimony would have been subject to privilege. *Id.,* 3–4.

■■■■■ "[I]nequitable conduct rendering a patent unenforceable arises when there is 'evidence of affirmative misrepresentation of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive.'" *Ulead Sys., Inc. v. Lex Computer & Management Corp.,* 351 F.3d 1139, 1144 (Fed.Cir.2003) (quoting *Dayco Products, Inc. v. Total Containment, Inc.,* 329 F.3d 1358, 1362 (Fed.Cir. 2003)) (other citations omitted).

> Both intent and materiality are questions of fact that must be proven by clear and convincing evidence. The inequitable conduct analysis is performed in two steps comprising "first, a determination of whether the withheld reference meets a threshold level of materiality and intent to mislead, and second, a weighing of the materiality and intent in light of all the circumstances to deter-

mine whether the applicant's conduct is *so culpable* that the patent should be held unenforceable."

*Dayco, supra,* at 1362–63 (quoting *Purdue Pharm., L.P. v. Boehringer Ingelheim GmbH,* 237 F.3d 1359, 1366 (Fed.Cir. 2001)). "Material" for purposes of unenforceability means that " 'a reasonable examiner would have considered such prior art important in deciding whether to allow the parent application.' " [3] *Id.* (quoting *Driscoll v. Cebalo,* 731 F.2d 878, 884 (Fed. Cir.1984)) (footnote added). "Information ... need [not] be prior art in order to be material, but 'instead embrace[s] *any* information that a reasonable examiner would substantially likely consider important in deciding whether to allow an application to issue as a patent.' " *Id.* (quoting *Akron Polymer Container Corp. v. Exxel Container, Inc.,* 148 F.3d 1380, 1382 (Fed. Cir.1998)).

■ As discussed *supra* the Acran and Yuasa systems, which apparently were not patented, did not rely on the use of a formed, flexible liner placed underneath the barriers and did not encompass the ability to remove and replace barriers *via* opening a door and bending the flexible liner. Assuming *arguendo* that the forms submitted to the examiner would have required disclosure of unpatented systems, a reasonable examiner would not have considered these simpler systems important in determining whether the patent should issue.

Moreover, because the '417 application was a continuation-in-part patent application, all of the information submitted in

connection with the '728 application was before the examiner. *Leviton Mfg. Co. v. Universal Sec. Inc.,* 304 F.Supp.2d 726, 753 (D.Md.2004). That application disclosed that the '728 patent was originally rejected due to the prior art of the Thomas patent which did include a liner. "[A]n applicant need not disclose a material reference if it is cumulative to or less material than those already before the examiner." *LNP Engineering Plastics, Inc. v. Miller Waste Mills, Inc.,* 275 F.3d 1347, 1360 (Fed.Cir.2001). A system disclosing a liner is clearly more material than one without such a liner. Therefore, the most that can be said about the Acran and Yuasa systems is that they were cumulative.

Moreover, the fact that the patent itself notes Article 64 of the Uniform Building Code, versus the Uniform Fire Code as pointed out by Ramsey, is not relevant.[4] Both Codes have the same requirements for containment of battery acid. **Exhibit 8,** *supra* **("With respect to batteries, Article 64 of the Uniform Building Code requires a four-inch high containment barrier with an acid neutralization capability to a pH of 7–9."); Exhibit 2, 1995 Supplement to the Uniform Fire Code,** *attached to* **Ramsey's Memorandum, at R0002–03 ("Each rack of batteries, or group of racks shall be provided with a liquid-tight 4–inch ... spill-control barrier ...." "The method shall be capable of neutralizing a spill from the largest lead-acid battery to a pH between 7.0 and 9.0.").**

Finally, Ramsey has woefully supported its motion for summary judgment.

**3.** The Court recognizes that in 1992 the Patent Office amended its rules to provide a narrower definition; however, the Federal Circuit has yet to apply that new standard. *Dayco, supra,* at 1364. Out of an abundance of caution, and because the old standard is broader, the Court will apply that one.

**4.** The patent no doubt cited the building code because the invention is to be placed inside buildings.

Whether [Defendants] meet[ ] the threshold level of materiality would require a detailed factual analysis of the relevance of the teachings of that reference both with respect to the claims of the patents-in-suit and with respect to the other prior art references that were before the examiner.

*Dayco,* 329 F.3d at 1367. Ramsey has not done this. Nor has it placed before the Court any evidence which would show intent. In fact, Ramsey's entire argument is based on speculation. " 'Intent to deceive cannot be inferred solely from the fact that information was not disclosed; there must be a factual basis for a finding of deceptive intent.' " *Catalina Lighting, Inc. v. Lamps Plus, Inc.,* 295 F.3d 1277, 1289 (Fed.Cir.2002) (quoting *Upjohn Co. v. Mova Pharm. Corp,* 225 F.3d 1306, 1312 (Fed.Cir.2000)) (other citations omitted). Nor do Ramsey's aspersions against Wang for seeking to quash the deposition subpoena show intent. As Frazier's attorney, Wang would have engaged in unethical conduct had he voluntarily given testimony about privileged communications with his client. Ramsey's allegations are not supported by evidence and are based on conclusory speculation. *North American Oil Co., Inc. v. Star Brite Distributing, Inc.,* 46 Fed.Appx. 629, 2002 WL 31060488 (Fed.Cir.2002).[5] Ramsey's motion is, therefore, denied; Defendants' cross-motion for summary judgment is granted.

**D. The Defendants' motion for summary judgment as to Plaintiff's unfair and deceptive trade practices claim, filed October 3, 2003.**

On June 29, 2002, the undersigned allowed Ramsey to file its supplemental amended complaint which contains a claim based on violations of North Carolina's Unfair and Deceptive Trade Practices Act, N.C. Gen.Stat. § 75.1.1, *et. seq.* The claim is based on the following factual allegations.

As previously noted, the '728 patent application was filed on October 27, 1999, and the patent ultimately issued on October 30, 2001. On July 23, 2001, Wang, as the patent attorney for EnviroGuard, wrote to Egan advising that a patent application was pending. **Exhibit 1,** *attached to* **Ramsey's Combined Response in Opposition to Defendants' Motion for Summary Judgment on Plaintiff's Unfair and Deceptive Trade Practice Claim [and] on its False Advertising Counterclaim ["Ramsey's Combined Response in Opposition"], filed October 20, 2003.** Wang advised that Ramsey's "Uni–Seal Containment System with the Spill Guard Battery Station Trays, as described on your website, likely will infringe the U.S. and foreign patents which we expect will be allowed to issue." *Id.* Wang also noted that if the letter were ignored, the Defendants would take any action necessary in the event that Ramsey's products infringed the patents once issued. *Id.*

On August 10, 2001, Plaintiff's attorney, J. Derel Monteith, Jr. (Monteith), responded to Wang with a request for "the complete, unredacted file histories of all pending patent applications which you and EnviroGuard believe to include pending claims, whether allowed or not, that cover any of Ramsey's products." **Exhibit 2,** *attached to* **Ramsey's Combined Response in Opposition.** On August 29, 2001, Wang responded that

[d]espite your insistence, we cannot give you or the Ramsey Group the confidential file history of my client's patent

---

**5.** The allegations, and the caustic nature thereof, certainly border on a violation of

Federal Rule of Civil Procedure 11.

application. The U.S. patent claims have been allowed and we expect a U.S. Patent to issue in the future. When the patent issues, you can obtain a copy of the official file history for your review. **Exhibit 4,** *attached to* **Complaint.**

On October 31, 2001, Egan learned that the '728 patent had issued and immediately wrote Monteith for a legal opinion as to whether the Ramsey product infringed the patent. **Exhibit 6,** *attached to* **Ramsey's Combined Response in Opposition**. One month later, Monteith made a notation in his file of a telephone conversation with Egan as follows: "after further careful review of frazier patent, including all claims and spec and file history, and after discussing w/DMC, rendered oral opinion to Ramsey Grp of noninfringement and likely invalidity of frazier patent. written opn to follow." Exhibit 7, *attached to id.* On December 7, 2001, Monteith provided Egan with a written legal opinion of noninfringement. Exhibit 9, *attached to id.* On March 13, 2002, Kenneth Cotton wrote to Egan to advise of infringement and to demand that infringing activities stop. Exhibit 10, *attached to id.*

During the summer and fall of 2001, Expo employed a Mr. Jones and a Mr. Zachau as sales personnel for the products manufactured and sold under the pending '728 patent. **Exhibit 3, Partial Deposition Transcript of Kenneth Cotton, dated February 19, 2003,** *attached to id.,* **at 27, 138**. Cotton explained to both Jones and Zachau that "we had a patent pending in the beginning, we felt that there was possible infringement, and that we were in litigation subsequent to that." *Id.,* at 139. Cotton told Jones that the only thing he could discuss with customers was that litigation was pending after the lawsuit had actually been filed, but he could not inform customers that Ramsey was infringing the patent. *Id.,* at 140. As to Zachau, Cotton did not authorize him to tell customers that infringement was a possibility; however, "I didn't tell him he couldn't say that, either." *Id.* The reason for the distinction between the two salesmen was that Jones covered a larger territory which did not include areas where Ramsey was a competitor. *Id.,* at 141. While Cotton had discussions with his sales personnel about the litigation and his belief that the Ramsey products were infringing, he did not authorize any other sales personnel to disclose this to customers. *Id.,* at 141–44.

SBC Services, Inc. (SBC) became interested in EnviroGuard's system in 2000 and met with Jones about the product in "approximately September 2001." **Exhibit 4, Letter dated November 13, 2001, to Cotton from Laura Crosby, SBC's Senior Contract Manager,** *attached to* **Ramsey's Combined Response in Opposition**. Laura Crosby of SBC advised Cotton that during that September meeting, Jones informed a SBC employee "that it appeared as though a competitor of EnviroGuard had infringed on its patent. Neither Erik [Jones] nor anyone else at EnviroGuard has broached this subject again with SBC." *Id.* Crosby further advised Cotton that while SBC dealt with numerous suppliers, it was cautious to avoid infringement and would further investigate the matter if Cotton provided her with specific information both as to the patent and the accusing products. *Id.* There is no indication in Crosby's letter that Jones identified Ramsey as the infringing party. Robert Burditt, who was the SBC employee involved in the meeting with Jones, testified that Jones did not identify the allegedly infringing party. **Exhibit 5, Partial Deposition Transcript of Robert Burditt, dated September 15, 2003,** *attached to* **Defendants' Motion for Summary Judgement on Deceptive Trade Practices Claim ["Defendants' Motion"], filed Oc-**

tober 3, 2003, at 65 ("[H]e did not tell me who it was.").

Ramsey alleges that SBC ultimately approved its product for use; however, it claims that approval was delayed due to concerns over the patent issue. **Exhibit 11, Partial Deposition Transcript of Robert Burditt, *attached to* Ramsey's Combined Response in Opposition. Robert Burditt facilitates product approval for SBC. Exhibit 5, *supra,* at 12.** There was delay between the successful field trial of Ramsey's product and the issuance of an approval notice because Burditt received a telephone call from Egan advising that Ramsey was in patent litigation with EnviroGuard. *Id.,* at 58.

Plaintiff's claims are based on (1) notification to Ramsey of possible infringement *via* the July 23, 2001 letter; (2) notification to Ramsey of actual infringement *via* the March 13, 2002 letter; (3) discussions by Cotton with sales personnel of possible infringement and litigation; (4) a comment by Jones to SBC employee Burditt that an unidentified competitor was infringing; and (5) a delay in product approval by SBC of Ramsey's products which Burditt attributed to Egan's admission that Ramsey was in patent litigation. Other allegations made by Ramsey are based solely on hearsay evidence and will not be considered.

█ As to the letters written to advise Ramsey of the issuance of the patent, federal patent law preempts state law and no claim for unfair or deceptive trade practices exists. *Mikohn Gaming Corp. v. Acres Gaming, Inc.,* 165 F.3d 891, 896 (Fed.Cir.1998). "The propriety of [a patent notice] depends on patent law and the patent issues to which the notice pertains." *Id.* "Furthermore, the Federal Circuit has made it clear that no liability can attach with respect to notice of patent existence letters, or any oral communications to the

same effect." *Vesture Corp. v. Thermal Solutions, Inc.,* 284 F.Supp.2d 290, 318 (M.D.N.C.2003) (citing *Mikohn,* at 897).

"A patentee has the right to inform a potential infringer of the existence of the patent, whereby the recipient of the information may adjust its activities, perhaps seek a license, or otherwise protect itself.... Federal law has uniformly upheld a patentee's right to publicize the issuance of patents and to so inform potential infringers."

*Id.* (quoting *Mikohn* ).

█ The remaining allegations more clearly relate to interference with potential contractual relations as the basis for a claim of unfair or deceptive trade practices. Ramsey basically alleges that the Defendants interfered with customer relations by advising that Ramsey was infringing the Defendants' patents.

[Ramsey] has not introduced, however, any admissible evidence proving that Defendants sent a written notice of infringement to a third party or potential customers. Even under North Carolina law, a claim for wrongful interference with prospective business advantage requires a showing of a "lack of justification for inducing a *third party* to refrain from entering into a contract with them which contract would have ensued but for the interference."

. . . . .

Federal precedent is that communication to possible infringers concerning patent rights is not improper if the patent holder has a good faith belief in the accuracy of the communication.... Indeed, a patentee, acting in good faith on its belief as to the nature and scope of its rights, is fully permitted to press those rights "even though he may misconceive what those rights are."

. . . . .

Accordingly, [Ramsey] has not sufficiently proven that Defendants improperly communicated to [Ramsey's] actual and prospective customers that [Ramsey's] product infringed [Defendants'] patents or that they made false and disparaging statements regarding [Ramsey's] product to actual and prospective customers.

*Id.* (quoting *Cameron v. New Hanover Mem. Hosp.,* 58 N.C.App. 414, 293 S.E.2d 901, 917 (1982) and *Mikohn, supra,* at 897). The Defendants' motion for summary judgment as to this claim is, therefore, granted.

**E. Expo Power Systems, Inc.'s motion for summary judgment on its false advertising counterclaim, filed October 3, 2003.**

It is undisputed that until December 2002, "Ramsey used ® trademark notices instead of ™ trademark notices in conjunction with the trade names of Ramsey's products without having pursued registrations of those trade names." **Ramsey's Combined Response in Opposition, at 4.** These marks were used in conjunction with the words and phrases "Uni–Seal," "Neutralizing Acid Absorber," "Spill Guard," "Neutralizing Conditioner," "Neutra–Clean," "First Responder," "Neutralizing and Absorbing Pillows & Booms," "Ni–CD Clean," "NI–CD First Responder," "NI–CD Neutralizing Absorber," "Neutralizing Absorber," "SW–910 Battery Room Safety Wear," "BSSR–1 Battery Safety Supplies Rack," "BCE–1AS Neutra–Clean," "RG–2500–1G Neutra–Clean," "NAP–12126 Neutralizing and Absorbing Pillows," and "NAB–BF Neutralizing and Absorbing Booms." **Exhibit A,** *attached to* **Expo's Memorandum.** In fact, even the "ram" design used on Ramsey's documents improperly claimed a trademark. **Exhibit C,** *attached to id.* Ramsey has admitted that it "currently has no trademark on the Register of the United States Patent and Trademark Office." **Exhibit B,** *attached to id.,* at 7. It also admitted that "it has no trademark 'used in connection with' the Uni–Seal spill containment system or any components used therewith that are on the Register of the United States Patent and Trademark Office." *Id.* Ramsey admitted that "it has not applied for any 'federal trademark registration.'" *Id.* And, Egan was aware that no such application had been made through November 2002. *Id.,* at 8.

Egan testified at his deposition that the Ramsey website contained information disclosing a trademark when no such mark had issued. **Exhibit D, Partial Deposition Transcript of John Egan, dated December 13, 2002,** *attached to* **Expo's Memorandum, at 68, 70–72, 74–75.** Egan also testified that he first became aware that Ramsey was using trademarks without having such marks properly issued during the year 2002. *Id.,* at 84. Despite having learned that such marks should not be used, neither he nor anyone under his control had taken any action to remove the marks from the Ramsey products. *Id.,* at 84–85. Egan also admitted that the presence of these marks on the website could be misleading to customers. *Id.,* at 146.

Todd Sechrist is employed by EnerSys, Inc. in Pennsylvania. **Exhibit G, Letter to Todd Sechrist, dated March 26, 2003, from Ann Marie Phillips,** *attached to* **Expo's Memorandum.** During a meeting at an undisclosed time with Egan, Egan advised Sechrist that "Ramsey had a patent pending that covered and protected the Uni–Seal Containment System and that [Egan] was very confident in his legal position and was going to communicate with those he deemed as infringing upon his product/rights." *Id.* Egan also told Sechrist that Ramsey was the "first to market and patent a spill containment sys-

tem with a liner." *Id.* Egan has denied making these comments. **Exhibit 14, Affidavit of John Egan, dated October 20, 2003, *attached to* Plaintiff's Combined Response in Opposition, at 2.** On December 5, 2001, Sechrist e-mailed Egan as follows: "I know you feel rock solid. Do you feel rock solid because you have been selling a flexible membrane for the last few years & /or different material?" **Exhibit H, *attached to* Expo's Memorandum.** Egan responded:

I am highly confident of the non-infringement conclusion based on the information generated during investigation of the patent. I have had a few experiences with lawyers over the years. I picked these terms in an attempt to let you know this is not a "qualified maybe." ... Our company carries a significant level of business liability insurance in an attempt to be a responsible corporate citizen. The reality of this issue is that patent holder can collect from the customer or those that contributed to the transaction if the party causing the infringement is not able to service the financial burden.... I am suggesting that it would not be a wise business decision to disregard flexible membrane containment systems solely on the basis of the patent issued to Doug Frazier.

*Id.*

On at least one occasion, Egan was advised by an attorney that the Uni–Seal Containment System infringed the Frazier patent. **Exhibit I, Partial Deposition Transcript of John Egan, dated March 13, 2003, *attached to* Expo's Memorandum, at 69.** And, on at least one occasion, Egan advised a potential customer that the Ramsey system did not infringe the '728 patent because that patent covered systems involving only vertical battery racks. *Id.,* at 212, 214–15. Egan admitted that

between April 2001 and April 2002, he determined to replace the word "liner" in promotional literature about the Ramsey system with the word "bladder" in part because of the Frazier patent. *Id.,* at 263–64.

The Lanham Act provides in pertinent part:

Any person who, on or in connection with any goods or service, ... uses in commerce any word, term, name, symbol or device, or any combination thereof, or ... any false or misleading description of fact, or false or misleading representation of fact, which -

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origins of his or her or another person's goods, services, or commercial activities shall be liable in a civil action by any person w ho believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).

Thus, a plaintiff asserting a false advertising claim under the Lanham Act must establish that:

"(1) the defendant made a false or misleading description of fact or representation of fact in a commercial advertisement about his own or another's product; (2) the misrepresentation is material, in that it is likely to influence the purchasing decision; (3) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience; (4) the defendant placed the false or misleading statement in interstate

commerce; and (5) the plaintiff has been or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products."

For liability to arise under the false advertising provisions of the Lanham Act, the contested statement or representation must be either false on its face or, although literally true, likely to mislead and to confuse consumers given the merchandising context. Where the advertisement is literally false, a violation may be established without evidence of consumer deception.... [A] court may find on its own that a statement is literally false[.]

. . . . .

■ In analyzing whether an advertisement ... is literally false, a court must determine, first, the unambiguous claims made by the advertisement ..., and second, whether those claims are false. A literally false message may be either explicit or conveyed by necessary implication when, considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated.

*Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 272–73, 274 (4th Cir.2002) (quoting *Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*, 284 F.3d 302, 310–11 (1st Cir.2002)) (other quotations and internal citations omitted). When an advertisement is literally false, then a plaintiff need not present evidence of consumer confusion. *Rhone–Poulenc Rorer Pharm., Inc. v. Marion Merrell Dow, Inc.*, 93 F.3d 511 (8th Cir.1996); *Clorox Co. Puerto Rico v. Proctor & Gamble Commercial Co.*, 228 F.3d 24 (1st Cir.2000).

■ It is axiomatic that affixing a trademark symbol to a product which has not been issued a mark is literally false.

*Upjohn Co. v. Riahom Corp.*, 641 F.Supp. 1209, 1223 (D.Del.1986) ("**False or misleading claims of patent protection clearly violate**" the Lanham Act); *S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 238 (2d Cir.2001) (citing *Coca–Cola Co. v. Tropicana Prod., Inc.*, 690 F.2d 312 (2d Cir.1982)); *Telebrands Corp. v. Wilton Indus., Inc.*, 983 F.Supp. 471 (S.D.N.Y.1997) (**Using the logo "As seen on TV" on product was literally false because television advertisement was not shown in areas of the country in which the seller was distributing the product**); *Hearst Business Publ'g, Inc. v. W.G. Nichols, Inc.*, 76 F.Supp.2d 459 (S.D.N.Y.1999) (**Deleting a word in order to misrepresent the inherent quality of a product is literally false**); *Janda v. Riley–Meggs Ind., Inc.*, 764 F.Supp. 1223 (E.D.Mich.1991) (**The Lanham Act creates a cause of action for any false representation of a product.**). Ramsey argues that the issue is whether this was done intentionally. However, the representation that Ramsey's products were copyrighted was literally false and no finding of intent is necessary.

> [I]t is clear that [the Lanham Act] does *not* require that the false description or representation be made willfully or with an intent to deceive. It was one of the purposes of the drafters of the Lanham Act that § 43(a) remove the requirement of willfulness and intent to deceive contained in the predecessor 1920 Act.

4 *McCarthy on Trademarks* § 27.51 (4th ed.2003). The Court finds the Expo is entitled to summary judgment as to its counterclaim of false advertising relating to the use of a non-existent copyright on Ramsey's products. As to the other claims of false advertising, summary judgment is inappropriate.

## V. ORDER

**IT IS, THEREFORE, ORDERED** as follows:

A. Ramsey's motion for partial summary judgment of non-infringement of the '417 patent is hereby **DENIED** as to Claims 1, 5, 6, 9, 12, and 13;

B. Expo's motion for partial summary judgment of infringement of the '417 patent is hereby **GRANTED** as to Claims 1, 5, and 6;

C. Expo's motion for partial summary judgment of infringement of the '417 patent is hereby **DENIED** as to Claim 12;

D. Expo's motion for partial summary judgment of infringement of the '417 patents is hereby **DENIED** as to induced and/or contributory infringement as to Claims 12 and 13;

E. Ramsey's motion for partial summary judgment of patent invalidity as to the '417 patent is hereby **DENIED**;

F. The Defendants' cross-motion for partial summary judgment of patent validity as to the '417 patent is hereby **GRANTED**;

G. Ramsey's motion for partial summary judgment of patent unenforceability as to the '417 patent is hereby **DENIED**;

H. The Defendants' cross-motion for partial summary judgment of patent enforceability as to the '417 patent is hereby **GRANTED**;

I. The Defendants' motion for partial summary judgment as to claims of violations of the North Carolina Unfair and Deceptive Trade Practices Act is hereby **GRANTED**; and

J. The Defendants' motion for partial summary judgment as to its counterclaim for false advertising under the Lanham Act is hereby **GRANTED** in part and **DENIED** in part.

**IT IS FURTHER ORDERED** that on or before 15 days from entry of this Order the parties shall advise the Court in writing not to exceed 7 pages of all issues and claims that remain in the action.